Murray S. SCUREMAN, et al., Plaintiffs,

v.

Richard B. JUDGE and Ingabritta Judge, Defendants–Third–Party Plaintiffs,

v.

Russell T. AARONSON, Jr., et al., Third–Party Defendants.

Civ. A. No. 1486–S.

Court of Chancery of Delaware, Sussex County.

Date Submitted: Sept. 30, 1992.
Date Decided: Oct. 29, 1992.

B. Wilson Redfearn, David G. Culley and Elizabeth Daniello, of Tybout, Redfearn & Pell, Wilmington, for Richard B. Judge.

William M. Chasanov, of Brown, Shiels & Chasanov, Georgetown, for Ingabritta Judge.

John A. Sergovic, Jr., of Sergovic & Ellis, Georgetown, for intervenor Rehoboth–By–The–Sea Realty Co.

Norman C. Barnett, of Schab & Barnett, P.A., Georgetown, for plaintiff and third-party defendant Sea Strand Owners.

James D. Griffin, of Griffin & Hackett, P.A., Georgetown, for plaintiffs Berman, Houlon and Berger.

J. Everett Moore, Jr. and John R. Kirk, of Moore & Rutt, Georgetown, for third-party defendant Draper and Carpenter Estates.

David A. Anderson, of Potter, Anderson & Corroon, Wilmington, for third-party defendant James L. Goodwill, III.

### *OPINION*

JACOBS, Vice Chancellor.

Pending is a motion for summary judgment brought by the defendants, Richard B. Judge and his wife, Ingabritta Judge (the "Judges"), who are the owners of Block 50½ in Dewey Beach, Delaware; and an intervenor, Rehoboth–By–The–Sea Realty Company ("RBTS"), the Judges' grantor and mortgagee. These parties are referred to collectively as the "movants." The property in dispute, Block 50½, is landlocked. The Judges cannot gain access to it because Block 50½ is bordered on the west by Silver Lake, on the east by the Atlantic Ocean, and on the north and south by private property. An original plot of the area, drawn in 1876, depicts a road called "Lake Drive" that was to be built around Silver Lake (then called Lake Charles) and Lake Comegys. Lake Drive has actually been built along the western side of Silver Lake,

but it remains unbuilt along a portion of the eastern side of Silver Lake and around Lake Comegys. The movants contend that that unbuilt portion of Lake Drive along the eastern side of Silver Lake is a publicly dedicated right-of-way that the Judges are entitled to use to gain access to Block 50½. Alternatively, the movants argue that the Judges are entitled to an easement by necessity. The pending summary judgment motion implicates the merits of those claims. Briefing on that motion was completed on September 30, 1992 and the parties waived oral argument. This is the decision of the Court on the summary judgment motion.

## I. FACTS

### A. The Parties and the Disputed Property

To the south of Block 50½, on portions of Blocks 49 and 50, lies the Sea Strand complex ("Sea Strand"). Sea Strand consists of four buildings that comprise 36 individual townhouse units. RBTS owns the land underlying Sea Strand, but leases it to the various owners of the townhouse units. To the immediate west of Sea Strand, also in Block 50, lie the Houlon, Berger, Berman, and Goodwill properties, each of which backs onto the southern side of Silver Lake. To the north of the Judges' property, on Blocks 51 and 52, lies an estate that for decades has been owned by members of the Carpenter and Draper families (the "Carpenter/Draper estate").

Because in this case there is merit to the adage that a picture may be worth a thousand words, Block 50½ and the relevant portions of properties surrounding it are depicted below, for illustrative purposes only and not precisely to scale. The drawing is based upon App. C–4,[1] and the shaded area represents the unbuilt portion of Lake Drive that is the subject of this litigation.

1. The Appendix to the Movants' Opening Brief is cited as (App. A–__.), the Appendix to the Respondents' Joint Answering Brief is cited as (App. B–__.), and the Appendix to the Movants' Reply Brief is cited as (App. C–__.).

The named plaintiffs are eight Sea Strand (Block 50) leaseholders and three fee simple (Block 50) landowners. The plaintiffs originally brought this action against the Judges for a declaratory judgment that the Judges were not entitled to use Lake Drive to gain access to Block 50½. The Judges responded by counterclaiming against the plaintiffs and filing a third-party complaint against (i) all 36 Sea Strand leaseholders, including the plaintiffs, (ii) all four Block 50 fee simple owners, and (iii) the Carpenter/Draper estate.

These third-party defendants are collectively referred to as the "respondents."[2]

B. *Background of the Dispute*

This litigation is the latest chapter in a long-standing and highly contentious dispute involving the Judges' effort to gain access to Block 50½. In that connection some history is instructive. The Judges purchased Block 50½ from RBTS on December 30, 1987. To enable the Judges to gain access to Block 50½, RBTS also conveyed its reserved right to use the common passageways between the Sea Strand build-

2. Several of the named third-party defendants have not answered the complaint and, hence, have not appeared in this action.

ings. Several Sea Strand residents sued Mr. Judge in this Court, challenging the legality of that conveyed right of access. After trial, this Court ruled that the Judges had obtained no legally valid easement from RBTS, and, therefore, were not entitled to use the common Sea Strand passageways to gain access to Block 50½. *Rago v. Judge*, Del.Ch., C.A. No. 1294, Hartnett, V.C., 1989 WL 25802 (March 16, 1989), *aff'd*, Del.Supr., 570 A.2d 253 (1990).

Unable to secure access to Block 50½ through the Sea Strand passageways, Mr. Judge attempted a different approach. He entered into a land sale contract with James L. Goodwill III to purchase Mr. Goodwill's property, which lies to the immediate west of Sea Strand. Mr. Judge sought access to Block 50½ starting from Chesapeake Street in Dewey Beach through the Goodwill property, and then across the northwest corner of Sea Strand along an unbuilt portion of Lake Drive. On October 13, 1990, Mr. Judge obtained preliminary approval from the Town of Dewey Beach for a subdivision plan based upon that proposed access route. That approval was made contingent upon Mr. Judge's acquiring title to the Goodwill property.

On December 19, 1990, the plaintiffs filed this action to challenge the Judges' proposed use of Lake Drive. As a result Mr. Judge was unable to proceed with his agreement to purchase the Goodwill property, and the Judges decided to establish their right of access to Block 50½ in this litigation. Accordingly, they answered the complaint, counterclaimed, and filed their third-party complaint against the respondents. On August 2, 1991, RBTS then moved to intervene as a party defendant, and its motion was granted.

### C. *The Origin of Lake Drive*

On September 27, 1855, Robert West, who owned approximately 135 acres to the east and south of Silver Lake, recorded a plot of his lands, entitled "Plot of Rehoboth City." (App. A–30.) On March 15, 1871, sixteen years and several conveyances later, the General Assembly, by private Act, incorporated The Rehoboth Association,

and "made [it] a body politic in law and in fact." 14 *Del.Laws*, Ch. 285, § 14 (App. A–69–71.). As declared in that Act:

> The object of said Association shall be the development of lands now held by the parties above named and such as may be acquired under this Act into a Watering Place and City for the benefit and accommodation of those who may choose to settle in or inhabit it.

*Id.* The Legislature also delegated to the Association certain powers and rights, including:

> *the right* to acquire by purchase, lease or contract, all such lands and tenements in the County of Sussex, as they deem necessary for the purpose of said Association, and *to lay out the same, or any part thereof into lots, streets, and alleys, squares and parks....* 14 *Del. Laws*, Ch. 285, § 24 (emphasis added).

Pursuant to that Act, the Rehoboth Association recorded a "New Plot of Rehoboth City" on May 3, 1876. That 1876 Plot relevantly provided that the Rehoboth Association "*does hereby lay out & dedicate to public use the City of Rehoboth & the several streets, avenues, alleys* thereof including said parts of streets *in accordance with the plans hereunto annexed.*" (App. A–72–73.) (emphasis added). One of the several plots that accompanied the text depicted streets and numbered blocks in the vicinity of Silver Lake. One of those streets was Lake Drive, which was shown as encircling Silver Lake. (App. A–75.) Over the years the streets and blocks laid out on these plots have reappeared in subsequent deeds, plots, and maps.

### II. *THE PARTIES' CONTENTIONS*

A motion for summary judgment will be granted only when no genuine issue of material fact is in dispute and the moving party is entitled to judgment as a matter of law. Ch.Ct.R. 56(c); *Nash v. Connell*, Del.Ch., 99 A.2d 242 (1953). The moving party has the burden of establishing to the satisfaction of the Court the absence of any genuine issue of material fact, and any doubt regarding the existence of such an

issue will be resolved against the movant. *Brown v. Ocean Drilling & Exploration Co.,* Del.Supr., 403 A.2d 1114, 1115 (1979).

By this motion the movants urge this Court to determine as a matter of law that Lake Drive is a dedicated right-of-way that affords the Judges access to Block 50½. In support of their position the movants advance five claims: (1) Lake Drive is a public highway by virtue of the actions taken by the Rehoboth Association in 1876 pursuant to the above-described legislation; (2) Lake Drive is a "common highway" by virtue of 17 *Del.C.* § 509, which declares (*inter alia*) that certain public roads are common highways; (3) Lake Drive is a "public road" by virtue of 17 *Del.C.* § 131(b); (4) Lake Drive is a dedicated and accepted public road at common law, or, alternatively, is a road over which the Judges have an implied common law right of private easement; and (5) should the above arguments fail, the Judges are entitled to an easement by necessity over the adjoining landowners' property. The respondents dispute all of these claims. They also raise the affirmative defenses of lack of ripeness, lack of standing, estoppel, laches, and adverse possession.

The respondents' threshold affirmative defenses are addressed first, in Part III of this Opinion. For the reasons discussed, the Court decides that this case is appropriate for summary judgment disposition and that the respondents' defenses are insufficient as a matter of law. The Court next determines that the movants are entitled to judgment on two of their claims, *viz.,* (1) that Lake Drive is a statutorily dedicated public highway; and (2) that Lake Drive is a "common highway" [3] by operation of 17 *Del.C.* § 509. Those claims, among others, are addressed in Part IV.

## III. *THE THRESHOLD AFFIRMATIVE DEFENSES*

### A. *Ripeness*

The respondents first argue that this case is not ripe for adjudication, because the Judges (i) failed to seek or obtain approval from the appropriate municipal and local authorities to construct that portion of Lake Drive over which they seek access; and (ii) failed to give notice to certain parties who may potentially be affected by an adjudication of this dispute. Neither contention, in my view, has merit.

The respondents' argument, if accepted, would stand the doctrine of ripeness on its head. It would require the Judges to obtain municipal and other local governmental approvals to build the disputed portion of Lake Drive before it is known whether Lake Drive even legally exists as a public right-of-way. Such a requirement would make no economic or legal sense, and it has been rejected by this Court. *Heathergreen Commons Condominium Ass'n. v. Paul,* Del.Ch., 503 A.2d 636, 639–42 (1985). Only the courts can determine the underlying property right (here, the legal status of Lake Drive) that necessarily must serve as the legal underpinning and predicate for whatever governmental approvals might ultimately have to be obtained. *See McDonald v. Board of Adjustment of Dewey Beach,* Del.Super., 558 A.2d 1083, 1087 (1989). Only if this Court first determines that Lake Drive is a right-of-way that the Judges may use to gain access to their property would any need for governmental approval(s) arise.[4]

---

3. The term "highway" has been described as "[a] generic name for all kinds of public ways including county and township roads, streets and alleys, turnpikes and plank roads, railroads and tramways, bridges and ferries, canals and navigable rivers." Byron K. Elliott & William F. Elliott, *A Treatise on the Law of Roads and Streets* (William F. Elliott ed., 4th ed. 1926) [hereinafter cited as "Elliott"] § 1, at 1–2 (footnotes omitted). A "public highway" is generally defined as a highway "under the control of and maintained by public authorities for use of the general public." *Black's Law Dictionary* 656 (5th ed. 1979). A "common highway" is a "road to be used by the community at large for any purpose of transit or traffic." *Id.*

4. Determining the location of highways is (at least in the first instance) an administrative, not a judicial, function. *See Mayor of Elizabeth v. New Jersey Turnpike Auth.,* 7 N.J.Super. 540, 72 A.2d 399, 401 (1950). The movants argue that if they prevail on this motion they would be entitled to petition the Department of Transporta-

■ The respondents' second contention is not one of ripeness, but, rather, of failure to join indispensable parties. The respondents argue that this case cannot go forward because the owners of properties surrounding Lake Comegys were not given notice of and an opportunity to be heard in this litigation. Those persons must be joined as parties (the respondents say) because this action concerns the legal status of Lake Drive, which, as originally plotted, encircles Lake Comegys as well as Silver Lake.

I disagree. Chancery Court Rule 19, to be sure, requires the joinder of parties in whose absence there can be no just adjudication. However, the owners of the properties that surround Lake Comegys are not in that category. Here the Court is asked to rule on the Judges' right of access over property that involves only a limited portion of Lake Drive and does not include the properties surrounding Lake Comegys. Moreover, any final decree granting relief to the movants can be crafted so as not to affect adversely the interests of property owners who are not before the Court. Ch. Ct.R. 19(b); *see Joseph v. Shell Oil*, Del Ch., 498 A.2d 1117, 1125 (1985).

For those reasons the ripeness defense is insufficient as a matter of law.

### B. *Standing*

■ The respondents next contend that the Judges lack good title to Block 50½, and, therefore, have no standing to claim access to that property across Lake Drive. The movants respond that their title is good and marketable, but in all events is sufficient to confer standing. Indeed, the movants argue, the respondents have no standing to object to the Judges' standing.

For the following reasons, the lack-of-standing defense must be rejected.

The respondents cite no authority for their argument that the Judges must first establish that they have clear title before they may seek relief from this Court. The one authority the respondents do cite requires that a party need only have "an interest in the outcome of the litigation which will warrant the court's entertaining it, or a legally protectible and tangible interest at stake in the litigation." 67A C.J.S. *Parties* § 12, at 662 (1978) (footnotes omitted); *see also Town of Berlin v. Santaguida*, 181 Conn. 421, 435 A.2d 980, 982 (1980); *In re Beister*, 487 Pa. 438, 409 A.2d 848, 851 (1979). The Judges easily meet that standard. They hold record title to Block 50½ and are in exclusive possession of that land. (App. A–1–3, 4, C–41). Neither the respondents nor anyone else claims any adverse interest in that property.[5] Were this an action to quiet title to their own property, the Judges would have standing, yet the respondents would not. *See Jackson v. Wax*, Del.Ch., 171 A. 755, 756 (1934); *Greenmont Lumber Corp. v. Berger*, 154 Vt. 121, 574 A.2d 153, 154–55 (1990). No reason is shown why the Judges' interest in Block 50½, while adequate to confer standing in an action to quiet title, is not sufficient to confer standing here.

Manifestly the Judges and RBTS have a legally protectable interest in the subject of this lawsuit. If there is no right of access to Block 50½, the value of that property will be drastically diminished. Landlocked property would be of little or no use to the Judges or anybody else. That monetary interest is clearly one for which a property owner is entitled to seek judicial protection.

---

tion for approval to construct Lake Drive according to specifications the Department might impose pursuant to 17 *Del.C.* § 508. (Letter from Mr. Culley to the Court, dated 9/21/92, at 5.) The respondents contend that the Town of Dewey Beach and the City of Rehoboth Beach would also have jurisdiction over the construction of Lake Drive, as might the Sussex County authorities, the U.S. Corps of Engineers and the Delaware Department of Natural Resources and Environmental Control. (Letter from Messrs. Barnett, Moore, and Griffin to the Court, dated

9/30/92, at 3 n. 4.) That issue is not before the Court, and need not be decided to determine this motion.

**5.** Although the respondents suggest that the State of Delaware might have some claim to the property, the State has disclaimed any such interest by stipulating to a dismissal with prejudice in an unrelated action wherein the State claimed an adverse interest. *Clark v. Judge*, Del.Ch., C.A. No. 1385 (Aug. 23, 1989).

Accordingly, the lack-of-standing defense is legally insufficient.

### C. *Equitable Estoppel*

■ The respondents also raise the defense of equitable estoppel. They argue that the Judges cannot use Lake Drive to develop Block 50½ because agents of RBTS represented to purchasers of Sea Strand units that Block 50½ would not be developed. The respondents claim that they relied upon those representations when they purchased or improved their respective properties. Accordingly, the respondents conclude that the Judges, as grantees of RBTS, are estopped to take any action that would violate their grantor's representations.

In *Judge v. Rago*, Del.Supr., 570 A.2d 253, 257 & n. 2 (1990), the Supreme Court found that RBTS had communicated to Sea Strand purchasers that it did not intend to develop Block 50½. Assuming without deciding that those representations would estop *RBTS* from developing that property at some later date, the question becomes whether the Judges, who knew nothing of RBTS's representations and whose deed contains no such covenant, are precluded from doing that which RBTS promised not to do.

I think not. "As a general rule, a grantee will not be estopped by any act, conduct, or declaration of his grantor of which he has no notice ... even though such act, conduct, or declaration would have supported an estoppel against the grantor." 31 C.J.S. *Estoppel* § 133, at 671 (1964) (footnote omitted); *see also* 28 Am.Jur.2d *Estoppel and Waiver* § 117, at 776 (1966) ("[A]ccording to the prevailing rule, a bona fide purchaser for value and without notice of an estoppel against his grantor is not bound by the estoppel...."). The respondents make no reasoned effort to argue why these principles do not control here. The Judges were grantees of RBTS and bona fide purchasers of Block 50½. They paid value ($1,000,000) for it. (App. A–1.) Nor do the respondents claim or demon-

strate that the Judges had notice of any representations by RBTS or its agents, or that the Judges agreed to be bound by those representations. Mr. Judge denies having received such notice, and that evidence is uncontroverted. (App. C–41.) Accordingly, the respondents have established no legally valid basis to assert a defense of equitable estoppel.

### D. *Laches*

■ The respondents next interpose the defense of laches. That defense operates to prevent the enforcement of a claim in equity if the plaintiff delayed unreasonably in asserting the claim, thereby causing the defendants to change their position to their detriment. *See Robert O. v. Ecmel A.*, Del.Supr., 460 A.2d 1321, 1325 (1983); *Shanik v. White Sewing Machine Corp.*, Del.Supr., 19 A.2d 831, 837 (1941); *H. & S. Mfg. v. Benjamin F. Rich Co.*, Del.Ch., 164 A.2d 447, 449 (1960). No laches defense is available here, because ever since the Judges purchased Block 50½ in December, 1987 (the relevant time for ascertaining whether any unreasonable delay occurred), they acted diligently to gain access to it. Moreover, the respondents have not demonstrated, by affidavit or otherwise, any prejudice to themselves as the result of the supposed delay on the Judges' part. Nor could they. After Mr. Judge sought to gain access to his property through the Goodwill property *in 1990*, he premised his actions on Lake Drive being an existing highway. When the respondents brought this lawsuit in response, the Judges promptly asserted counterclaims and third-party claims based on that same premise. There is no showing that the Judges' assertion of their position was dilatory or prejudicial to the respondents.[6]

### E. *Adverse Possession*

Finally, the respondents contend that they have adversely possessed the disputed portion of Lake Drive, thereby extinguish-

---

6. The respondents also argue that the movants' delay resulted in the unavailability of witnesses and of material evidence. That argument incor- rectly assumes, however, that RBTS was some- how required to file this action long before 1987, when it sold Block 50½ to the Judges.

ing the Judges' right of access (if any) over that area. The respondents are incorrect.

 Elsewhere in this Opinion the Court determines that Lake Drive is an officially dedicated public highway. *See infra* Part IV B. A public highway, be definition, belongs to the public and is open to all. A public highway cannot be lost to adverse possession, because there can be no lawful adverse private possession of or encroachment upon a public thoroughfare. That is the rule at common law and in Delaware. *Singewald v. Girden*, Del.Ch., 127 A.2d 607, 613, 616 (1956); *Miller v. Town of Seaford*, Del.Ch., 194 A. 37, 40 (1937); *Allender v. Mayor and Council of Wilmington*, Del.Ct.Gen.Sess., 76 A. 610 (1906); 2 *Elliott, supra* note 3, § 1188, at 1165 n. 6. Because (as this Court later finds) Lake Drive was lawfully dedicated and has never been closed or abandoned, it cannot be adversely possessed by a private party. *Cf. Delaware Land & Dev. v. First and Central Presbyterian Church of Wilmington, Del., Inc.*, Del.Supr., 147 A. 165, 179 (1929) (permitting adverse possession of roadbed where road had been closed for over 100 years).

\* \* \*

Because none of the respondents' affirmative defenses is legally valid or creates a triable issue of fact, summary judgment will be granted dismissing those defenses. I turn now to the movants' affirmative claims for relief.

## IV. *THE MOVANTS' AFFIRMATIVE CLAIMS*

The movants advance various substantive claims for why Lake Drive is a dedicated public right-of-way over which the Judges may gain access to Block 50½. However, before those claims can be addressed the Court must first resolve a threshold question: whether there exists a genuine issue of disputed material fact that

prevents the granting of summary judgment on one or more of those claims.

### A. *The Asserted Issue of Material Fact*

The respondents contend that there exists a threshold factual dispute concerning the physical location of Lake Drive. The logic of their argument runs as follows: (1) for the movants to succeed, they must establish that the plotted but as-yet unbuilt portion of Lake Drive can feasibly be constructed; (2) that inquiry requires the Court to determine the precise location of Lake Drive; (3) the issue of location is purely factual; (4) there is evidence (although vigorously disputed) that Lake Drive's precise location is underwater, *i.e.*, under Silver Lake, and (5) that evidence, if credited by the Court, would establish that the portion of Lake Drive at issue here cannot feasibly be built or used; thus, in no event could this Court grant the movants access over it.

The movants respond that no issue of material fact exists, because this Court must conclude as a matter of law that Lake Drive is located along the present shoreline of Silver Lake.

The alleged factual dispute as to Lake Drive's location arises because of (among other things) the timeworn condition and imprecision of the original plot plan recorded by the Rehoboth Association in 1876.[7] We know that Lake Drive was meant to encircle Silver Lake, but do not know the dimensions of Silver Lake as it existed in 1876. (App. A–75.) Aerial photographs of Silver Lake and the properties adjoining it reveal their changing contours, but are too inexact to be helpful here. (App. B–311–13.) The respondents proffer surveys to support their position that key portions of Lake Drive are now underwater (App. B–302–10). The movants proffer their own surveys, and counterargue that in recent decades Silver Lake has receded. (App. C–2, 3–6.) To complicate matters further, (i) references to Lake Drive were "mysteri-

---

7. The respondents concede that the copy of the plot plan on file with the Sussex County Recorder of Deeds is "virtually unreadable." (Joint Ans.Br. at 18). The original plot, on file in the State Archives, is also conceded to be in "poor condition." (*Id.*) A photocopy of a photograph of the original was produced, but is difficult to decipher. (App. B–314.) The plot plan contains no metes and bounds, and can only be used to provide scaled distances. (Joint Ans.Br. at 18.)

ously" deleted from several relevant deeds (Movants' Op.Br. at 16, 17); and (ii) other deeds refer to a survey, prepared by James Davidson in 1897, that the parties cannot locate. (*Id.* at 10.)

The respondents' strongest evidence that Lake Drive cannot feasibly be built are three surveys, prepared by Mr. Jay Wingate, indicating that certain unbuilt portions of Lake Drive are presently underwater. Mr. Wingate surveyed the properties of three of the fee simple owners in Block 50—parcels that border Silver Lake on the south and lie southwest of Block 50½. Mr. Wingate measured the boundaries of the properties from Chesapeake Street on the south to Silver Lake on the north, and also analyzed the scaled distances of certain old plots made by the Rehoboth Association and by RBTS. Based on his surveys, Mr. Wingate concluded that Lake Drive, as plotted, lies approximately 100 feet under the waters of Silver Lake for two of the three properties surveyed, and lies mostly underwater for the third. (App. B–304–10).[8]

In response, the movants argue that the present location of Lake Drive is legally fixed by the relevant deeds that refer to Lake Drive as a right-of-way or road that exists alongside Silver Lake. Those deeds mandate that wherever Silver Lake presently may be located, Lake Drive must always lie on the solid ground that encircles Silver Lake. To support that position, the movants present three surveys, prepared by Mr. William J. Mann, which cover the northern, eastern, and southern sides of Silver Lake. To fix the location of Lake Drive, Mr. Mann examined the deed references to Lake Drive, made on-site surveys, determined the high-water line of Silver Lake, and measured off a fifty-foot strip from the shoreline. (App. C–2.)[9] According to the movants, this survey method (following natural and artificial monuments referenced in deeds) is legally superior to scaling, and as a matter of law the Court must reject the respondents' surveys and whatever conclusion the respondents seek to draw from them.

If this case involved a boundary dispute that posed a choice between two conflicting surveys, each based on the same deeds, that conflict would be factual and, thus, not amenable to summary judgment disposition. *See Downs v. Carnvale*, Del.Super., C.A. No. 84C–DE7, Chandler, J., Mem.Op. at 7–8, 1987 WL 18114 (Oct. 1, 1987); *Sowles v. Beaumier*, Me.Supr., 227 A.2d 473, 476 (1967); *Zawatsky Constr. v. Feldman Dev.*, Md.Ct.App., 100 A.2d 269, 271 (1953); *Wood v. Hildebrand*, 185 Md. 56, 42 A.2d 919, 921 (1945); *Will v. Piper*, 184 Pa.Super. 313, 134 A.2d 41, 44–45 (1957). But that is not this case. The dispute here requires an interpretation of the authoritative deeds that underpin and form the legal foundation of any survey. That question is necessarily one of law. 12 Am.Jur.2d *Boundaries* § 116 (1964).

Of critical importance are the deed references to Lake Drive as a property boundary, which appear in the chains of title to all of the relevant properties surrounding Silver Lake. For unknown reasons those references were not included in certain recent deeds to those properties. For example, since 1966 the deeds to the present Houlon and Berger properties within Block 50 fix the northern boundary of those properties at "the approximate shore line of Silver Lake." (App. A–127, 129, 131, 145,

---

**8.** Although for present purposes any doubt concerning the presence of a material fact issue must be resolved against the movants, *Brown v. Ocean Drilling & Exploration Co.*, Del.Supr., 403 A.2d 1114, 1115 (1979), Mr. Wingate's surveys appear to lack a valid foundation. Mr. Wingate does not disclose what versions of what plots he primarily relied upon, and neither 1876 document lends itself to precise measurement. *See supra* note 7. Mr. Wingate also does not disclose which deeds he examined, and which formed the basis of his surveys. Accordingly, even if the Wingate surveys were legally rele-

vant, they would not be entitled (at least on this record) to any significant weight.

**9.** Mr. Mann testified that Mr. Thomas Pepper followed this same method in 1956 when he surveyed what are now the Houlon and Berger properties. (App. C–2.) Mr. Pepper's survey has been incorporated into several deeds and shows Lake Drive as a boundary of fifty-foot width extending from the shore of Silver Lake. (App. A–119, 122, 125.)

147, 149, 151.) However, earlier deeds to those same properties describe the northern boundary as "the edge of Lake Drive," and incorporate a survey depicting Lake Drive as a fifty-foot extension from the shore of Silver Lake. (App. A–119, 122, 125.) A 1975 deed to what are now the Berman and Goodwill properties (within Block 50) refers to a "fifty foot (50′) right-of-way situate on the Northwestern two (2) tracts adjoining Silver Lake." (App. A–133–34.) Those references were deleted in the later deeds to those properties beginning in 1979. (App. A–137, 141.) Again, in a 1965 deed transferring title to Block 51 (and conveying a right of access across Block 52 to Penn Street) from Margaretta duPont Carpenter to Renee Draper, Silver Lake is described as the boundary (App. A–116.). However, earlier deeds to that same property reserved "fifty (50) feet along the shore line of said lake for a roadway." (App. A–112, 115.) The original 1876 deed concerning Blocks 51 and 52 (among others), from the Rehoboth Association to Charles A. Mayer, reserved land along the banks of Silver Lake for Lake Drive. (App. B–273.) [10]

Surprisingly, the movants do not apprehend or discuss the legal and practical significance of these deletions. Had they done so, it would have been evident that the applicable law eliminates any claimed fact dispute as to whether Lake Drive is underwater or on dry land.

 A grantor can convey only such title and interest in land that he actually owns. 26 C.J.S. *Deeds* § 104(b) (1956). If because of a material mistake in the description of the boundary of conveyed property a deed conveys more than a grantor owns, the error is without legal effect and may be judicially corrected. 23 Am.Jur.2d *Deeds* § 214 (1983). In this case, because the earlier references to Lake Drive as a boundary or right-of-way were omitted from later deeds in the same chain of title, the grantees in those later deeds received a greater interest than their grantors had to convey.[11] Legally, that cannot be. In those circumstances the boundary descriptions in the earlier deeds will control as a matter of law. *Solomons Island Yacht Club, Inc. v. Elliott,* 31 Md.App. 508, 357 A.2d 848, 853 (1976); *Waterhouse v. Smith,* Me.Supr., 560 A.2d 1100, 1101 (1989). It therefore must be concluded that the current deeds to the respondents' properties (or some of them) improperly convey the land upon which Lake Drive is located.

 That conclusion renders legally immaterial the Wingate surveys upon which the respondents rely. A survey may be considered as evidence of a boundary only if it is consistent with the property description in the authoritative source deed. *State ex rel. Buckson v. Pennsylvania R.R.,* Del.Super., 228 A.2d 587, 596 (1967), *aff'd,* Del.Supr., 267 A.2d 455 (1969); *Walker v. Provost,* Me.Supr., 566 A.2d 749, 750 (1989); *Solomons Island Yacht Club, Inc.,* 357 A.2d at 852–53. In this case, the authoritative deed language legally compels the conclusion that Lake Drive is located alongside or nearly adjacent to Silver Lake, and would in no event be located underwater. *See State v. Phillips,* Del. Ch., 400 A.2d 299, 303–04 (1979), *aff'd,* Del. Supr., 449 A.2d 250 (1982). Since they are inconsistent with the result legally mandated by the authoritative deeds, the Wingate surveys and the conclusion the respondents seek to draw from them must be rejected.

Accordingly, the respondents have not established that the movants' affirmative claims for relief present an issue of disputed material fact. Those claims are proper subjects of a summary adjudication, and I now address them.

### B. *The Statutory Claims*

#### 1. Introduction

The movants present several claims based on different legal theories for why

---

10. This problem does not exist for the Sea Strand property, as all relevant deeds to that land refer to "Lake Drive" as the boundary.

11. That is, the grantees were being granted land that included Lake Drive itself. However, the grantors only had the right to convey land up to (but not including) Lake Drive.

Lake Drive is a dedicated right-of-way over which the Judges have a legal right to gain access to Block 50½. I find that the movants are entitled to judgment on two of those claims. For reasons of clarity, those two claims are more properly viewed as a single claim that is grounded upon alternative legal arguments.

The material facts are uncontroverted. In 1871, the General Assembly incorporated the Rehoboth Association as a "body politic" and granted to it the power to acquire lands in Sussex County and "to lay out the same, or any part thereof into lots, streets, and alleys, squares and parks" in what was then called Rehoboth City. 14 *Del.Laws*, Ch. 285, § 24. On May 3, 1876, the Rehoboth Association, acting pursuant to that delegated authority, recorded a "New Plot of Rehoboth City," declaring that the Association "does hereby lay out & dedicate to public use the City of Rehoboth & the several streets, avenues, alleys thereof ... in accordance with the plans hereunto annexed." (App. A–73.)

Based upon those facts, the movants advance two related legal positions. First, they argue that the laying out of Lake Drive by the Rehoboth Association constituted a statutory dedication equivalent to the establishment of a public highway by direct state legislation. That is, the movants contend that Lake Drive legally became a public highway when the Rehoboth Association officially plotted it as such in 1876. Second, the movants argue that Lake Drive is a "public road" that became a "common highway" by operation of 17 *Del.C.* § 509. That statute, in its present form, provides:

> All public roads, causeways and bridges laid out as such, or made by lawful authority, or which have been used as such and maintained at the public charge for 20 years or more are declared to be common highways. The usage by the public for 20 years or more of any road shall not cause the road to become a common highway or public road unless the same has been maintained at the public charge for 20 years or more.

To be precise, since the Judges' second claim rests upon the plotting of Lake Drive by the Rehoboth Association in 1876, they actually contend that Lake Drive became a "common highway" by operation of a predecessor to § 509, § 1566 of the Revised Code of 1915. Section 1566 provided:

> All public roads, causeways and bridges, heretofore laid out as such, or made by lawful authority, or which have been used as such, and maintained at the public charge for 20 years, are declared to be common highways.

The movants contend (in the language of that statute) that Lake Drive is a "public road" that was "made by lawful authority" and was "laid out as such," and, therefore, is a "common highway" over which the public has access.

■ These arguments are best understood in light of historical perspective. An early Delaware decision, *Johnson v. Stayton*, Del.Super., 5 Harr. 448 (1854), describes the legal framework giving rise to the movants' claims:

> Public roads may exist by public authority or by private dedication. In the former case they are laid out by order of court, or by act of assembly, and are proved by the record; in the latter they may be proved by long usage and enjoyment, and being kept up by the public.

*Id.* at 449. The claims being advanced here concern the former case, *i.e.*, the creation of a public road by public authority. In the nineteenth century public roads were created by public authority in Delaware as follows:

> From the earliest times the full and entire jurisdiction over roads and highways has been exercised by the Legislature of this State.... Prior to the Constitution of 1897 the Legislature repeatedly and on numerous occasions provided by special Act for certain roads, and named in the Act of Assembly those persons who were to act as commissioners to carry the Act into effect.... This control [over highways] is often delegated through the instrumentality of local governmental subdivisions and, at times, as toll roads by private to quasiprivate cor-

porations which have been created or governed by legislative acts.

*State ex rel. Morford v. Emerson*, Del.Super., 10 A.2d 515, 522–23 (1939), *aff'd*, Del. Supr., 14 A.2d 378 (1940). Thus, the doctrinal basis for the movants first contention—that Lake Drive is a public highway created by public authority [12]—is solidly rooted in our jurisprudence.

■ So likewise is the basis for the movants' second contention, which invokes 17 *Del.C.* § 509 and its predecessors. Those statutes restate (and codify) the common law of statutory dedication and modify the common law with respect to private dedication (an issue not relevant here).[13] As thus viewed, § 509 adds no new legal requirements for effecting the statutory dedication of Lake Drive. That is, if Lake Drive is a "public road" or "public highway" under common law principles of statutory dedication, then it is also a "common highway" under § 509.[14]

Having discussed the nature of, and relationship between, these two statutory dedication claims, I now turn to the parties' contentions respecting the merits of each.

### 2. Dedication by Delegated Legislative Power

The movants first argue that they are entitled to access over Lake Drive because it was dedicated and accepted as a public highway by statutory enactment; *viz.*, by the General Assembly incorporating the Rehoboth Association in 1871, and by the Rehoboth Association, pursuant to its lawful delegated authority, officially plotting Lake Drive in 1876.

■ The respondents urge that this claim is defective because (i) the movants must also show, in addition to dedication, acceptance of Lake Drive, and (ii) no such showing was made here. The respondents acknowledge that a state has the sovereign power to dedicate a public highway by legislative act. They also concede that had the General Assembly dedicated Lake Drive directly, no separate act of acceptance would be required. The respondents argue, however, that the dual power to dedicate and accept a public highway resides solely in the state legislature, which cannot delegate that power to a political subdivision or an inferior agency. Therefore, the respondents conclude, a municipality cannot effect a complete dedication of a public highway in a single act; rather, the municipality's offer of dedication must be independently accepted, either by public authority or by public user.

The movants counter that no separate act of acceptance is legally required, because no meaningful distinction can be drawn between the power of the State and the power of its political subdivisions to dedicate a public highway. The movants' position, in my view, is the correct one.

The scope of a state's ability to delegate its power over highways is broad:

The legislature may grant to local governmental agencies very broad and comprehensive authority.... But, as we believe, it is not quite accurate to say that public corporations may be invested with sovereign power, although it is unquestionably true that they may be invested with powers that are in their nature legislative and sovereign. The authorities

---

12. In various deeds Lake Drive is referred to, variously, as a "public highway," a "roadway," a "street" or a "right-of-way." The plot recorded by the Rehoboth Association refers to "streets" and "avenues." The terminological distinctions are not, practically speaking, important, since the public character of Lake Drive as either a road or a highway is not in doubt. "Presumptively all roads laid out under legislative enactments are public ways belonging to the state and under the full control of the legislature." 1 Elliott, *supra* note 3, § 10, at 12.

13. At common law, twenty years of interrupted use of a private road by the public was suffi-

cient to establish the dedication of a private road to public use. Section 509 and its predecessors ameliorated the harshness of that common law rule by requiring both twenty years of public use *and* of public maintenance before a private road could be deemed a public road. *See Johnson*, 5 Harr. at 449–50.

14. The predecessor statute upon which the movants rely is entitled "Public Highways," and it essentially sets out a statutory definition of a highway, whether "public" or "common." *See supra* note 3.

are in substantial harmony upon the proposition that the legislature may invest local bodies with exclusive jurisdiction over the public ways of the locality. . . .

1 Elliott, *supra* note 3, § 513, at 579. And, where the power to establish highways is concerned, "[t]he legislature may ... delegate this power to other agencies as it may determine, such as political subdivisions or local authorities, to be exercised by reason of such statutory delegation in the manner prescribed." 39A C.J.S. *Highways* § 29, at 721 (1976); *see also DeCapua v. City of New Haven,* 126 Conn. 558, 13 A.2d 581, 582 (1940); *Fulton v. Town of Dover,* Del. Ct.Err. & App., 12 A. 394, 397 (1888); *Emerson,* 10 A.2d at 523; *Knowles v. Knowles,* 25 R.I. 325, 55 A. 755, 756 (1903).

The weight of authority, in Delaware and nationally, indicates that a state legislature's power to dedicate a highway without a showing of acceptance is delegable. *Singewald v. Girden,* Del.Ch., 127 A.2d 607 (1956), supports the proposition that the General Assembly may delegate to a State administrative agency the power to dedicate and accept public highways simultaneously. *Id.* at 614, 617.

Were this a case involving an effort by a private party to dedicate a road, then an independent act of acceptance, either by public user or by action of public authorities, would be required. *Vetter v. Diamond State Telephone,* Del.Supr., 450 A.2d 877, 882 (1982); *Kelly v. Phillips,* Del.Ch., 118 A. 230 (1922). However, this case involves the formal dedication of a street by a municipality pursuant to legislatively delegated authority. In those cir-

cumstances the law governing state legislative dedications applies, and no separate act of acceptance is required. *See State of California v. United States,* 9th Cir., 169 F.2d 914, 921–22 (1948) (applying California law); *Gewirtz v. City of Long Beach,* N.Y.Supr., 69 Misc.2d 763, 330 N.Y.S.2d 495, 505 (1972) ("Reason suggests that when it is the municipality which is making the dedication, the element of acceptance is not required, or if the element of acceptance is to be insisted upon, it may be implied from the very act of dedication by the municipality."), *aff'd,* N.Y.App.Div., 45 A.D.2d 841, 358 N.Y.S.2d 957 (1974); 23 Am.Jur.2d *Dedication* § 42, at 38 n. 98 (1983); 39A C.J.S. *Highways* § 36, 724 (1976); 26 C.J.S. *Dedication* § 34(a), at 462 (1956).

The respondents cannot point to any Delaware authority which establishes requirements for dedication by a municipality or other political body, different from those governing dedication by the State.[15] Because there is no independent requirement of acceptance, and because the evidence of official dedication is uncontroverted,[16] this Court concludes that Lake Drive is a public highway created in 1876 by the Rehoboth Association pursuant to authority duly conferred by the General Assembly. Accordingly, the movants are entitled to judgment on this claim as a matter of law.

3. The Operation of 17 Del.C. § 509

As previously noted, the movants also argue that those same actions taken in 1876 by the Rehoboth Association establish the movants' alternative claim that Lake Drive is a "common highway" by virtue of 17 *Del.C.* § 509. Although the movants

---

**15.** The respondents rely upon *Nolan v. Eastern Co.,* Del.Ch., 241 A.2d 885 (1968), *aff'd sub nom., Nolan v. Hershey,* Del.Supr., 249 A.2d 45 (1969) and *Brosius–Eliason Co. v. Dimondi,* Del.Ch., C.A. 11338, Berger, V.C., 1991 WL 242640 (Nov. 15, 1991), but neither case is apposite. In *Nolan* a portion of a street known as "New York Avenue" was found not to constitute a public highway. *Nolan,* 249 A.2d at 888–89. The *Nolan* Court found that the land at issue was not covered by the relevant statute, 19 *Del.Laws,* Ch. 205, and that the developer had not formally acknowledged an intent to dedicate, as that statute required. *Id.* at 889. The relevant teaching of *Nolan* is that to effectively dedicate a public

highway a private dedicator must comply with the requirements of the governing statute. *Brosius–Eliason* is also unhelpful for the respondents. There, the Court found "absolutely no evidence of statutory dedication," *Brosius–Eliason, supra,* at 6, but again, the procedures contemplated by the relevant statute had not been observed. *Id.* at 2.

**16.** The respondents base much of their brief on the argument that acceptance is required. They do not dispute that Lake Drive was lawfully plotted by the Rehoboth Association.

appear to rely upon § 509 as an independent source of legal authority for dedicating a public road, as earlier noted, § 509 merely restates (with one exception not applicable here) the common law of dedication by a public authority.

 Section 509 has been construed as recognizing three alternative methods for creating a "common highway": (1) formal dedication by a private owner; (2) official dedication by a public authority; or (3) twenty years of public use and public maintenance. *Deakyne v. Commissioners of Lewes*, D.Del., 329 F.Supp. 1133, 1137 (1971) (applying Delaware law), *on remand from* 416 F.2d 290 (3d. Cir.1969), *motion for new trial denied*, 341 F.Supp. 952 (1972), *aff'd*, 475 F.2d 1394 (1973). The movants argue that the second enumerated method is applicable here and that Lake Drive is (in the words of § 509) a public road "made by lawful authority." [17] I agree.

The Court in *Deakyne* has defined a public road "made by lawful authority" thusly:

A public road "made by lawful authority" means one that was established prior to 1935 by Court Order in the manner prescribed by [statute] or by the State Highway Department or by the Town of Lewes under its Municipal Charter or by some like public authority pursuant to law.

*Id.* at 1137 n. 8 (citations omitted). The movants contend (following *Deakyne*) that the powers of dedication granted to the Rehoboth Association pursuant to the 1876 Act of Incorporation are indistinguishable from the powers granted to "the Town of Lewes under its Municipal Charter." *Id.; Compare* 24 *Del.Laws*, Ch. 220 §§ 9, 10 *and* 43 *Del.Laws*, Ch. 170 § 10 *with* 14 *Del.Laws*, Ch. 295 § 24 (App. A–69–71.). The special Act incorporating the Rehoboth Association legislatively authorized that Association to lay out and record Lake Drive, and the Association lawfully exercised that authority. Therefore, the movants argue, the dictate of § 509 that "all

public roads ... made by lawful authority ... [are] common highways" is plainly applicable to Lake Drive.

The respondents do not respond to this argument frontally. Rather, they do it obliquely by arguing as follows: (1) Section 509 does not dispense with the requirement of a separate act of acceptance; its sole purpose is to prevent the forfeiture of private lands; (2) if § 509 transforms public roads into common highways by operation of law, then another statute, 17 *Del.C.* § 131, would become meaningless; and (3) *Nolan v. Eastern*, 241 A.2d 885, and *Brosius–Eliason Co. v. Dimondi*, *supra*, are inconsistent with the movants' construction of § 509. None of these arguments has merit.

The respondents argue (and cite cases to support) their proposition that the sole purpose of § 509 is to modify the common law to protect the rights of private owners of roads who do not object to public use of their roads but who had no intent to dedicate them to the public. *See, e.g., Lofland v. Truitt*, Del.Ch., 260 A.2d 909, 913 (1969); *State v. Southard*, Del.Gen.Sess., 66 A. 372, 373 (1907). That is a purpose of § 509, but not the only one. That purpose, moreover, is relevant only to the branch of § 509 that recognizes that a common highway may be created by 20 years of public use and public maintenance—not this case. Both *Deakyne* and the plain language of § 509 clearly recognize two other, equally valid, methods of creating a common highway. One of those methods—the dedication of Lake Drive by a public authority—is applicable here. Where, as here, a common highway is created by that method, § 509 requires no separate act of acceptance.

Equally unpersuasive is the respondents' argument that is based upon 17 *Del.C.* § 131(b). That statute provides:

All roads and streets situate in unincorporated suburban communities throughout the State which were built or created between July 1, 1935, and July 1, 1951, whether paved or unpaved, shall henceforth be under the absolute care, man-

---

17. The movants also contend that Lake Drive was (in the words of § 509) "laid out as such." Because this Court finds that Lake Drive was "made by lawful authority," it does not address that alternative contention.

agement and control of the Department and shall be maintained, repaired and reconstructed by the said Department.

By its own terms, § 131(b) applies only to a specific, narrow class of roads, namely, those built or created between 1935 and 1951 in unincorporated suburban communities. Section 509, on the other hand, embraces three broad categories of public roads, and declares that they are "common highways" to which (as a consequence) the State gains title, *see* 17 *Del.C.* § 1304(b). The two statutes are neither redundant nor inconsistent, and nothing in § 131(b) defeats the movants' claim that Lake Drive is a "common highway" by operation of § 509.[18]

Because Lake Drive is a "public road" that was "made by lawful authority," it follows that Lake Drive is also a "common highway" by operation of 17 *Del.C.* § 509 and its predecessors. Accordingly, the movants are also entitled to judgment on this ground.[19]

### C. *Remaining Common Law Claims*

Because the plaintiffs have prevailed on two of their statutory claims, the Court need not (and therefore does not) address the plaintiffs' remaining claims. In particular, since this Court has found that Lake Drive is a dedicated highway, no easement by way of necessity need be created. *See Pencader Assocs., Inc. v. Glasgow Trust,* Del.Supr., 446 A.2d 1097, 1099–1100 (1982).

### V. *CONCLUSION*

For the foregoing reasons, the motion for summary judgment will be granted (a) in favor of the movants on their claims that Lake Drive is both a statutorily dedicated public highway and a "common highway" by operation of 17 *Del.C.* § 509; and (b) against the respondents, whose affirmative defenses are legally insufficient. Counsel shall submit a form of order implementing the rulings herein.[20]

---

**18.** The respondents' third argument, based upon *Brosius–Eliason* and *Nolan,* falls of its own weight. Neither case involved a lawful statutory dedication, and no showing is made that the "made by lawful authority" language of § 509 would have been applicable to the facts in those cases.

**19.** One statutory claim that cannot go forward is the movants' contention that Lake Drive is a "public road" within the meaning of 17 *Del.C.* § 131(b). That statute requires that Lake Drive must have been "created," *i.e.,* brought into exis-

tence, between July 1935 and July 1951. Plainly it was not, because that event took place in 1876 when Lake Drive was first laid out on a plot.

**20.** Those rulings are intended to affect only the portion of Lake Drive on the east side of Silver Lake, depicted on the drawing on page 9, *supra,* of this Opinion. Those rulings should not be construed as a "green light" to construct or use the disputed portion of Lake Drive as a public accessway, until the Judges have first obtained the requisite approvals by all governmental agencies having jurisdiction over the matter.