**COURT OF CHANCERY
OF THE
STATE OF DELAWARE**

SAM GLASSCOCK III
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: January 26, 2022
Date Decided: January 27, 2022

Scott G. Wilcox, Esquire
Moore and Rutt, P.A.
1007 N. Orange Street
Suite 446
Wilmington, DE 19801

John A. Sergovic, Jr., Esquire
Sergovic Carmean Weidman
McCartney & Owens, P.A.
25 Chestnut Street
Georgetown, DE 19947

Armand J. Della Porta, Jr., Esquire
Marshall Dennehey Warner
Coleman & Goggin
1007 N. Orange Street
Suite 600
Wilmington, DE 19801

Re: *Revocable Trust Agreement of Nancy E. Cook dated
October 2, 2006 v. John R. Stanch, et al.*
C.A. No. 2021-0972-SG

Dear Counsel:

Before me is the Petitioner's action to quiet title to a portion of lots 29 and 30 of the Keen-Wik Subdivision, on the northern end of Assawoman Bay in rural Selbyville.[1] The original deed out to those lots (which I will refer to collectively as "Lot 30") was from Charles and Pearl Adkins to Joseph and Lenore Frazier in 1965

---

[1] A graphic representation of the area in dispute is included herein as Exhibit A.

(the "Lot 30 Deed"). The Lot 30 Deed provided that Lot 30 ran from the easterly side of Bay Berry Road, extending to the east "such a distance as will reach [Roy] Creek" as surveyed and plotted by George B. Cropper. That survey of the plot plan to Keen-Wik (the "Cropper Survey") shows the southern boundary of Lot 30 extending from Bay Berry Road to the Roy Creek on a bearing of 86 degrees 49 minutes 55 seconds.

South of Lot 30, the adjoining lot was Lot 31. The original deed out to Lot 31 was from the Adkins to Dale and Helena Mumford (the "Lot 31 Deed," and, together with the Lot 30 Deed, the "Deeds Out"). It is consonant with the Lot 30 Deed, in providing that Lot 31 runs from Bay Berry Road to Roy Creek as set out in the Cropper Survey of 1959. Again, the Cropper Survey shows the northern boundary of Lot 31 running from a point on Bay Berry Road on a line bearing 86 degrees 49 minutes 55 seconds to Roy Creek.

In dispute in this litigation is a narrow strip of land along the boundary of Lot 30 and the parcel to the south now denominated as Lot 31A. The parties agree that the line demarcating these lots starts at a common point on the east side of Bay Berry Road marked by an iron pipe. Of this there is no dispute. The Petitioners allege that the boundary between the properties is called for in the original Deeds Out, running from the iron pipe to the Roy Creek on a bearing of 86 degrees 49 minutes 55 seconds (the "Bearing"). The property line running from the common

2

iron pipe (the "Common Point") on the Bearing to the Roy Creek I shall refer to as the "Division Line."

The Respondents contend that the Division Line is not the true property line. Instead, they claim a narrow triangle of land (the "Sliver") with one side running from the Common Point to a point on the bulkhead bordering Roy Creek, some 14 inches north of the easterly termination of the Division Line. I shall refer to this proposed boundary line as the "Axios Line."

This matter was submitted for an expedited trial on January 21, 2022 and January 25, 2022, with further submissions on January 26, 2022. What follows is my resolution of this boundary line dispute, in favor of the Petitioners.

First, I note, several issues were resolved on the record on the first day of trial. The Petitioners had moved for adverse possession of the Sliver. The evidence presented in their case in chief, I found, was inadequate to this purpose. Similarly, the Respondents sought dismissal based on laches and lack of subject matter jurisdiction. I denied those motions orally. The reasons for all the decisions described above are adequately stated on the record and I will not revisit them here.

The dispute in this matter was sincere and the litigation hard-fought; nonetheless, it is rather easily resolved. It arose via a mistake in the deed that created the newly denominated Lot 31A, which the Respondents own. The evidence at trial indicated that a prior owner of Lots 31 and 32, via deeds, recombined the lots and

3

then resubdivided them, presumably to adjust the interior boundary line between Lots 31 and 32 to make them more valuable. The results were reconstituted Lots 31A and 32A. The Respondents rely on this origin deed for their lot as creating their interest in the Sliver. That deed, from Robert and Helen Shepard to Roger and Ilene Hammond, conveyed Lot 31A "being a resubdivision of Lot Number 31." The description in the deed of the line between Lot 30 and Lot 31A is consistent with the Division Line. The northerly boundary of Lot 31A runs from the Common Point "thence along and with the line of Lot Number 30, North 86 degrees 49 minutes 55 seconds East 100 feet, more or less, to the line of a wood bulkhead." That is, the deed explicitly adopts the Bearing and makes the Division Line the northern most property line of 31A. The accompanying survey, done by John B. Gary, Inc. (the "Gary Survey"), also adopts the Bearing as defining the northern property line. Subsequent deeds in the Respondents' chain of title also adopt the Bearing, including the latest deed of October 21, 2019, between a Delaware LLC and the Respondents, the Stanchs. The Respondents rest their argument to the Sliver on two anomalies in the Gary Survey. First, the Gary Survey contains an illustration of Lot 31A showing the northern property line running from the Common Point to an angle in the "wood bulkhead" (the "Angle"). The Division Line actually runs to a point several inches south of the Angle. Based on the Gary Survey, the Respondents argue that the Angle *must* therefore coincide with the property line, but neither of the source deeds

4

reference the bulkhead, let alone call the run of the property line to an angle in the bulkhead. Second, the Gary Survey calls for a run along the bulkhead of 49 feet to the south. At that point, the survey calls for a southerly property line to Lot 31A running back along a certain bearing to the point of origin on Bay Berry Road. The western property line runs along Bay Berry Road for 50 feet back to the Common Point. There is an error in this survey, as demonstrated by the fact that it does not close using the distances and bearings given. The Respondents argue that the distance called out along the bulkhead must control, and achieve that by running their property north 14" along the bulkhead, incorporating the terminus of the Axios Line.[2]

The Respondents had a survey done of the property by E. Scott Wallis of Axios (the "Wallis Survey"), which agrees in large part with the Respondents position, but for a different reason. The Wallis Survey begins in reliance on the Gary Survey. As with all pertinent surveys, the Wallis Survey relies on the iron pipe at the Common Point. Wallis notes that the Gary Survey depicts a found concrete monument on the Division Line near the bulkhead. Wallis found what he contends was the monument, broken but not materially disturbed in location. This monument was not on the Division Line running on the Bearing to the bulkhead, however. Instead, it was a few inches north of the Division Line. Wallis used this to create a

---

[2] This creates a new bearing for the property line between Lots 30 and 31A, obviously.

new property line, the Axios Line, by extending the bearing from the iron pipe, over the center of the broken monument, to the bulkhead. The resulting Sliver is the property in dispute. The Axios Line terminates nearer the bulkhead angle than the Division Line. It uses a different bearing for the northern and southern boundaries to Lot 31A than called in the Deeds Out. Unlike the Gary Survey, it does close to a point, however.

As to the Respondents' theories, as stated above, the bulkhead Angle is not itself a monument, and at the time of the Deeds Out in the 1960s, there is no evidence that any bulkhead was in place. The Gary Survey's depiction of a 49' run along the bulkhead may be relevant to the boundary between Lot 31A and 32A, but cannot shift the boundary to the north from the original Division Line separating Lot 30 and Lot 31.

The only remaining indication that the Axios Line is correct is the location of the broken concrete monument. The Wallis Survey ignores the Bearing and relies on the monument to set the boundary, based, according to his expert report, on the established rule of deed and survey interpretation that man-made monuments trump bearings in defining property transferred. There are two reasons this observation is true but not dispositive.

The first is that the origin deeds *do not* contain a call to a concrete monument. When the lots were created and deeded out in the 1960s, there was an origin point

6

along Bay Berry Road that the parties agree is now marked by the iron pipe at the Common Point. The Division Line is described as running from that point, down a bearing, 100 feet more or less, to "the Creek." Roy Creek is a natural monument, and thus takes precedence over the distance. Absent, however, is any mention of a monument set on the line. The monument relied on by Wallis must, I conclude, have been set by some subsequent surveyor. It does not control the boundary of the two lots (Lot 30 and Lot 31(A)) because it is not a part of the Deeds Out.

The second reason I disregard the monument is the testimony of witnesses including the surveyor for a survey[3] done before Wallis, who found the monument on the Division Line, *not* on the Axios Line as found by Wallis. Moreover, the monument as found by this survey was intact, rather than broken as found by Wallis. Mr. Greg Hook, of Simpler Surveying & Associates, Inc., testified that he saw the monument intact on the Division Line sometime after the completion of the Simpler Survey in August 2020, and that he later saw the broken monument several inches away on the Axios Line, in March of 2021, shortly after the Wallis Survey was complete. I find both Hook and Wallis credible. I conclude, therefore, that the monument was shifted between the times of these surveys.[4] I need not determine

---

[3] The Petitions commissioned two surveys, by Simpler Surveying & Associates, Inc. (the "Simpler Survey"), done on August 18, 2020; and Adams-Kemp Associates, Inc., done on October 1, 2020. They, and all of the numerous other surveys of record apart from Wallis, adopt the Division Line as the boundary.

[4] Wallis testified that a layman shifting a marker is a practical impossibility, and that his examination of the soil around the broken monument indicated that it had not been moved. Hook,

7

here who moved the monument or under what conditions. It is sufficient to my analysis to find, by a preponderance of the evidence, that it was moved, and therefore cannot trump the Bearing.

It is the blackest of black-letter law that a grantor cannot convey more than she owns.[5] The grantors of Lots 31A and 32A, Robert and Helen Sheppard, made those grants from the combined original Lots 31 and 32. The northern boundary to those lots is set by the original Deeds Out, which adopted the plan for Keen-Wik, and which set the boundary as running from the Common Point, out to the Bearing, to Roy Creek. This boundary line is the Division Line, not the Axios Line. Since the grantors did not own the Sliver on the north side of the Division Line, they could not convey it to the Respondents' predecessor in title. The Sliver, therefore, is part of Lot 30, and belongs to the Petitioner.

The Respondents make a final argument. They note that the bulkhead in front of their property continues to the Angle, as already described, a few inches north of

---

however, testified that the soil condition was consistent with the monument having been dug out and reinterred.

[5] *See, e.g.*, *State v. Sweetwater Point, LLC*, 2017 WL 2257377, at *8 (Del. Ch. May 23, 2017) ("[O]ne may convey only what she owns."); *ABC Woodlands, L.L.C. v. Schreppler*, 2012 WL 3711085, at *4 (Del. Ch. Aug. 15, 2012) ("[I]t is well established that a grantor can convey title only to land that he or she actually owns."); *Scureman v. Judge*, 626 A.2d 5, 16 (Del. Ch. 1992) (same), *aff'd sub nom. Wilmington Tr. Co. v. Judge*, 628 A.2d 85 (Del. 1993); *Matter of Tax Parcel Nos. WD-00-063-00-01-01.00-00001 & WD-00-063-00-01-34.00-000*, 2020 WL 1527079, at *3 (Del. Ch. Mar. 31, 2020) (same) (citation omitted), *report and recommendation adopted sub nom. In re Tax Parcel Nos. WD-00-063-00-001-01-00-00001 and WD-00-063-00-01-34.00-000*, 2020 WL 1875460 (Del.Ch. Apr. 14, 2020).

the Division Line. They put evidence in the record showing that details of construction—the size of the pilings, and the shape of the washers—are different on the two sections of bulkhead that meet at the Angle, and that the bulkhead has been in place, based on surveys, for more than 20 years, and probably much longer. This is surely true; much of Keen-Wik appears to be filled land, and the bulkheads almost certainly date back to the time of the creation of the lots, in 1959 or thereafter.

The Respondents argue as follows. One of their predecessors in title must have built the bulkhead, and that builder ran this bulkhead across the property line to a spot a few inches onto the Petitioners' property, to about the point where the Axios Line intersects the bulkhead. This, per Respondents, was an open, notorious and hostile act that has persisted for over twenty years, and the Respondents have thus obtained the Sliver by adverse possession.

This argument, to my mind, borders on the frivolous. Open, notorious and hostile use over the prescriptive period, where demonstrated by a preponderance of the evidence, can defeat record title.[6] Such a divestiture of record title is disfavored, thus the necessity of strict proof of the proposition. Here, the proof is entirely lacking. Assuming that the differences in the nominal dimension of the pilings, and the different shape of the washers, on the two sections of bulkhead prove anything, it is that the sections of seawall were built at different times. But what is utterly

---

[6] *Tumulty v. Schreppler*, 2015 WL 1478191, at *12 (Del. Ch. Mar. 30, 2015).

9

lacking is any evidence of who built the bulkheads, and whether they were built before or after the Deeds Out in the 1960s. Just as likely as the Respondents' theory, is that the bulkheads were built in sections following the Roy Creek bank by the developer as the lots were filled with material dredged to create the Keen-Wik lots and canals. Assuming the Respondents are correct that a predecessor in title, and not the developer, built the bulkhead, there is no evidence that the slight trespass onto Lot 30 was hostile, rather than permissive, to allow a completion of the retaining wall beneficial to both lots. A further problem with Respondents' theory is that the trespass they theorize, if it *did* amount to prescriptive use, could not pass title to the Sliver, which originates at the Common Point almost 100' from the bulkhead.[7] Adverse possession cannot divest the Petitioners' title to the Sliver.

I do note, however, that the Petitioners' quiet title action was expedited to accommodate a property closing in January, and that it was unclear whether the Counterclaim was to be tried in the expedited portion of this matter. The Petitioners evidently did not think so; they never filed an answer to the Counterclaim, nor was it mentioned in the parties' pretrial stipulation. Respondent's Counsel at the close of the second day of trial asked to amend the Counterclaim to conform to the evidence, to seek an easement over a small portion of Lot 30 to maintain and repair

---

[7] In fact, the bulkhead that extends from the Respondents' property to the Angle is not, strictly speaking, on Lot 30; instead, it is on the boundary between Lot 30 and a navigable waterway, Roy Creek.

10

the bulkhead. The evidence at trial showed that there is a hole in the seawall some of which is fronting Lot 30, through which erosion damage to Lot 31A is occurring. The Respondents also submitted convincing evidence that repairing the bulkhead will require rods tying the seawall to sleepers or deadmen buried parallel to the wall. Repair of the bulkhead, accordingly, will require minor entry onto Lot 30.

Because the Counterclaim was not clearly part of the expedited portion of this action, and because an answer has not yet been filed, I see no prejudice in allowing an amendment of the Counterclaim seeking to establish an easement over a small portion of Lot 30 to maintain and repair the bulkhead. Such repair, I note, is in the interest of the integrity of *both* Lot 31A and Lot 30. I also note that if lack of maintenance of the bulkhead on one of these lots causes damage to the adjoining lot, liability therefore may result. Accordingly, I find it in the interest of justice to permit the amendment; the Counterclaim, amended to seek an easement, remains for further litigation.[8]

In conclusion, the parties should provide a form of order consistent with this Letter Opinion, quieting title to the Sliver in the Petitioners. The order should refer to the Simpler Survey, already recorded in the chain of title to Lot 30. The

---

[8] I attempted to secure an agreement to reciprocal maintenance easements in way of the bulkheads, but the parties were unable to agree. If Lot 30, as anticipated, goes to closing, perhaps neighborly reasonableness between the lot owners can yet prevail.

11

Counterclaim for a maintenance easement remains for further litigation. The parties should submit a form of order no later than the close of business today.

Sincerely,

/s/Sam Glasscock III

Vice Chancellor

SGIII/lkpr

**Exhibit A**

