**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

PATRICIA W. GRIFFIN
MASTER IN CHANCERY

CHANCERY COURTHOUSE
34 The Circle
GEORGETOWN, DELAWARE 19947

Final Report:  March 31, 2020
Draft Report:
Date Submitted:   February 14, 2020


Nicole M. Faries, Esquire
Baird Mandalas Brockstedt, LLC
Little Falls Centre One
2711 Centerville Road, Suite 401
Wilmington, DE 19808

Gary R. Dodge, Esquire
Curley Dodge Fitzgerald & Funk, LLC
250 Beiser Blvd., Suite 202
Dover, DE 19901

RE:   *In the Matter of Tax Parcel Nos. WD-00-063-00-01-01.00-00001 and*
      *WD-00-063-00-01-34.00-000*
      C.A. No. 2018-0733-PWG

Dear Counsel:

Pending before me is an action by a landowner seeking to quiet title to 13.55 acres of land that joins her two separate properties.  She also seeks to establish title to the land by adverse possession.  The property dispute arises because she and neighboring landowners have competing claims for ownership of 3.6 acres encompassed within the 13.55 acre parcel.  The landowner claiming rights to the

13.55 acre parcel filed a motion for summary judgment arguing that recorded deeds and boundary markers show her ownership of the entire parcel, including the 3.6 acres. The neighboring landowners oppose summary judgment, alleging that disputed material factual issues exist concerning ownership of the 3.6 acre parcel. I recommend the Court deny the motion for summary judgment because material factual issues exist. This is a final report.

## I.    Background

At the center of this dispute is a 3.6 acre, landlocked wooded parcel of land ("Disputed Parcel"), located in Kent County, Delaware. The Disputed Parcel is the hub between two neighbors' separate parcels of farmland: Petitioner Janet Szelestei ("Szelestei"), acting individually and as Trustee of the Steve Szelestei, Jr. Revocable Trust ("Trust"), owns properties to the north of the Disputed Parcel, on Ford's Corner Road, and to the south of it, on Butterpat Road. Respondents James and Nancy Melville ("the Melvilles") own properties to the east of the Disputed Parcel, also fronting on Ford's Corner Road, and to the west, on Butterpat Road. The importance of the Disputed Parcel to both parties arises from its unique location – Szelestei uses the Disputed Parcel to cross between her north and south properties, and it also permits the Melvilles to cross between their east and west properties.

2

Szelestei's petition, filed on October 11, 2018, seeks to quiet title on a 13.55 acre parcel [hereinafter "Gibbs parcel"], including the Disputed Parcel. Szelestei claims to have obtained title to the Gibbs parcel from the Estate of William Gibbs ("Gibbs Estate") through a deed executed on June 26, 1992 ("1992 Deed").[1] She contends that William Gibbs ("Gibbs") obtained title to the Gibbs parcel from Thomas Victor Clark ("Clark") on September 12, 1907. She seeks to reform the 1992 Deed and a subsequent deed on December 8, 2009 ("2009 Deed")[2] to (1) correct errors in the description of the Gibbs parcel, which was described as "11 acres, more or less" instead of 13.55 acres, which she asserts is the correct acreage according to a 1993 survey, and (2) eliminate the incorrect statement that the Gibbs parcel was originally a part of 112 acres of land deeded from William S. H. Davis ("Davis") to Louis and Susan Portas on September 8, 1910 ("Portas Deed"), since she claims its title was conveyed separately from Clark to Gibbs. Szelestei also asserts that her family has used and adversely possessed the entire Gibbs parcel since at least 1992, by permitting persons to hunt on that parcel and maintaining a

---

[1] The 1992 Deed, which was recorded on July 6, 1992, was a quitclaim deed from Rachael Brown, sole heir of Esther Mordecai, who was an heir of William Gibbs, to Szelestei and her husband, Steve Szelestei, Jr., conveying the Gibbs parcel. Docket Item ("D.I.") 21, at A-017 - A-018.

[2] The 2009 Deed conveys the Gibbs parcel from Szelestei and Steve Szelestei, Jr., to Steve Szelestei, Jr., as Trustee of the Trust. *Id.*, at A-015 - A-016.

path over the Disputed Parcel connecting her two properties. Further, she asks for attorneys' fees under the bad faith exception.

In the Melvilles' November 13, 2018 answer and counterclaim, they deny Szelestei's ownership claims, argue that they have good title to the Disputed Parcel through the Portas Deed, and seek attorneys' fees.

Following discovery, Szelestei filed a motion for summary judgment ("Motion"), on December 31, 2019, seeking invalidation of the Melvilles' quitclaim deed and reformation of the 1992 and 2009 Deeds. She claims that the recorded deeds and historical property boundary markers show that she is the owner of the Gibbs parcel, which includes the Disputed Parcel.[3]

The Melvilles, in their January 31, 2020 answering brief, argue that they own the Disputed Parcel through the Portas chain of title, and that the surveys and monuments do not support Szelestei's claims.

---

[3] Initially, Szelestei moved in the summary judgment for an award of attorneys' fees, arguing that fee shifting is appropriate because the Melvilles acted in bad faith by intentionally disregarding signs of her ownership, by inserting a wooden stake on the Gibbs Parcel, and by recording a January 10, 2013 quitclaim deed conveying the Disputed Parcel from National Enterprises, Inc. to them. *Id.*, at 27-30. The Melvilles deny any bad faith on their part or any notice of Szelestei's claim to the Disputed Parcel prior to their recordation of the 2013 quitclaim deed, since the 1992 and 2009 Deeds did not provide a description with metes and bounds or monuments, and described 11 (not 13.55) acres. In Szelestei's reply, however, she asks to reserve the bad faith claim for argument at trial, if the matter proceeds past summary judgment, or reserves further argument, if summary judgment is granted. D.I. 25, at 12. Both Szelestei's bad faith claim and the Melvilles' attorneys' fees claim in their counterclaim will be decided after trial.

## II.    Standard of Review

Under Court of Chancery Rule 56, the court grants a motion for summary judgment when "the moving party demonstrates the absence of issues of material fact and that it is entitled to a judgment as a matter of law."[4]  The moving party bears the burden of demonstrating that no material issues of fact are in dispute and that it is entitled to judgment as a matter of law.[5]  Once the moving party has satisfied that burden, it falls on the non-moving party to show that there are factual disputes.  Evidence must be viewed "in the light most favorable to the non-moving party."[6]  Summary judgment may not be granted if there is a "reasonable indication that a material fact is in dispute," or if the Court determines that it "seems desirable

---

[4] *Wagamon v. Dolan*, 2012 WL 1388847, at *2 (Del. Ch. Apr. 20, 2012); *see also Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.*, 1996 WL 506906, at *2 (Del. Ch. Sept. 3, 1996), *aff'd*, 692 A.2d 411 (Del. 1997).

[5] *Wagamon*, 2012 WL 1388847, at *2; *Lundeen v. Pricewaterhousecoopers, LLC*, 2006 WL 2559855, at *5 (Del. Super. Aug. 31, 2006).

[6] *Williams v. Geier*, 671 A.2d 1368, 1389 (Del. 1996) (citing *Merrill v. Crothall-American, Inc.,* 606 A.2d 96, 99 (Del. 1992)); *CelestialRX Investments, LLC v. Krivulka*, 2017 WL 416990, at *12 (Del. Ch. Jan. 31, 2017) (citation omitted); *Erickson v. Centennial Beauregard Cellular, LLC*, 2003 WL 1878583, at *2 (Del. Ch. Apr. 11, 2003).

to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances."[7]

## III.    Analysis

To grant Szelestei's Motion, I consider whether she is entitled to judgment as a matter of law and whether material factual issues exist.  Although Szelestei's claim pertains to the entire Gibbs parcel, at its core, this action addresses Szelestei's and the Melvilles' competing claims for ownership of the Disputed Parcel.

Parties "seeking to remove a cloud on title must prevail on the strength of their own titles and may not rely on the weakness of another's title."[8]  In a dispute involving deeds, the "construction of a deed is a question of law upon which the court must rule."[9]  "The fundamental rule in construing a deed is to ascertain and give effect to the intent of the parties as reflected in the language they selected."[10] The "scope and extent of a grant [of land] contained in a deed depends upon the

---

[7] *Cf. Williams*, 671 A.2d at 1388-89 (citing *Ebersole v. Lowengrub,* 180 A.2d 467, 470 (Del. 1962)); *Hendry v. Hendry*, 2006 WL 1565254, at *7 (Del. Ch. May 26, 2006) (citation omitted); *In re Estate of Turner*, 2004 WL 74473, at *4 (Del. Ch. Jan. 9, 2004) (citation omitted).

[8] *Smith v. Smith*, 622 A.2d 642, 646 (Del. 1993); *see also State v. Sweetwater Point, LLC* [hereinafter *Sweetwater Point*], 2017 WL 2257377, at *8 (Del. Ch. May 23, 2017).

[9] *Rohner v. Niemann*, 380 A.2d 549, 552 (Del. 1977); *see also Smith*, 622 A.2d at 645.

[10] *Smith*, 622 A.2d at 646; *see also Phillips v. State, ex rel. Dep't of Nat. Res. & Envtl. Control*, 449 A.2d 250, 253 (Del. 1982); *Sweetwater Point,* 2017 WL 2257377, at *8.

meaning of the language of the deed, and where that language contains ambiguities the deed must be read in the light of the intent of the parties as determined by the facts and circumstances surrounding the transaction."[11]  Ambiguities are resolved "in favor of the grantee so long as such a construction does not violate any apparent intention of the parties to the transaction."[12]  However, a "grantor can convey only such title and interest in land that he actually owns."[13]  In construing deed language, there is an order of preference involving various factors: calls "to natural monuments take the first priority, then to artificial monuments, then to courses of distances, then to acreage.  Calls to adjoiners [or adjoining properties] are akin to calls to artificial monuments."[14]  However, this order of preference is not "absolute" but a tool to be used in ascertaining the grantor's intent.[15]

---

[11] *Rohner*, 380 A.2d at 552.

[12] *Smith*, 622 A.2d at 646 (citing *Rohner*, 380 A.2d at 552); *Richard Paul, Inc. v. Union Imp. Co.,* 91 A.2d 49, 53 (Del. Ch. 1952).

[13] *Scureman v. Judge,* 626 A.2d 5, 16 (Del. Ch. 1992), *aff'd sub nom. Wilmington Tr. Co. v. Judge*, 628 A.2d 85 (Del. 1993); *see also ABC Woodlands, LLC v. Schreppler*, 2012 WL 3711085, at *4 (Del. Ch. Aug. 15, 2012).

[14] *Sweetwater Point*, 2017 WL 2257377, at *8; *see also McCabe v. Wilson*, 1986 WL 15429, at *10 (Del. Super. Dec. 10, 1986) ("primary [preference] for re-establishing the location of the lands that are the subject matter of a deed or survey is a natural monument.  The next item of preference are monuments other than natural monuments, such as permanently located stakes or manmade markers. . . . Monuments, including calls to adjacent boundaries, take precedence over distances and direction calls in a deed").

[15] *Sweetwater Point*, 2017 WL 2257377, at *8.

To begin the analysis, I review the relevant deeds in the chains of title. Many of the deeds are old and unclear, and their descriptions of the land being transferred use references to adjoining properties. The relevant deeds start with a conveyance of 149 acres "more or less" from Nathaniel Williams to Clark ("Clark property"), in a deed recorded on January 9, 1906.[16] Clark transferred 10 acres of that land to Warner Vanderveldt ("Vanderveldt parcel") in a deed recorded on February 19, 1907,[17] and the remainder – described as 149 acres more or less in the deed – to Frank Shakespeare ("Shakespeare") in a deed recorded on May 2, 1909.[18] Shakespeare then conveyed his interest in the property to Davis in a deed recorded on June 18, 1909.[19] The next conveyance is critical to this action – Davis conveyed 112 acres "more or less" of all the lands that were conveyed to him by Shakespeare to Louis and Susan Portas ("Portas property"), with the following limitation:

> excepting a small lot of land contracted for by Samuel E. Harris on September 23, 1907 containing fifteen acres . . . and also a small lot contracted to be sold to Williams Gibbs on September 12, 1907 containing eleven (11) acres, and also a small lot of ten (10) acres sold

---

[16] D.I. 21, at A-036 - A-037.

[17] *Id.*, at A-038 - A-039.

[18] *Id.*, at A-040 - A-041. Since a grantor cannot convey more than he owns, the land Shakespeare received from Clark could not include the land previously conveyed by Clark to Vanderveldt. Therefore, the acreage conveyed to Shakespeare would be reduced by the amount of land conveyed to Vanderveldt.

[19] *Id.*, at A-042 - A-044.

and conveyed by Thomas V. Clark to Warner Vanderveldt which deed is dated the eighth day of January A.D. 1907 and of record in the Recorder's Office at Dover . . .[20]

So, the Portas Deed, recorded on January 2, 1910, transferred 112 acres "more or less" to the Portases, which consisted of all of Davis' rights to the 149 acres "more or less" he received from Shakespeare minus 10 acres previously sold by Clark to Vanderveldt, 15 acres contracted to be sold to Samuel E. Harris ("Harris") in 1907, and 11 acres contracted to be sold to Gibbs.

Subsequently, Davis conveyed 18 acres "more or less" to Harris and his wife in a deed recorded on May 5, 1911 ("Harris parcel").[21] The Melvilles contend the Harris parcel was purchased by National Enterprises, Inc. ("N.E.") in a monitions sale in 1968,[22] and was subdivided into three smaller parcels.[23]

---

[20] *Id.*, at A-045 - A-047.

[21] D.I. 24, at B-002 - B-003.

[22] *Id.*, at 8. The deed executing the transfer to N.E. due to the monitions sale leaves some unanswered questions. Although the deed refers to 18 acres (which was the size of the Harris parcel) and an erroneous description in a deed from Davis to Harris related to the property, the sale proceeded because of unpaid taxes assessed against "Henry Gibbs and Mattie Mae Gibbs, his wife," not Harris. *Id.*, at B-004 - B-006. And it states that "prior deeds to this property may be found in the Office for the Recording of Deeds, at Dover, Kent County, Delaware in Deed Record Book L, Volume 20, Page 97," which does not appear to be where the Harris Deed is located. *Id.*, at B-005.

[23] N.E. sold 2.8429 acres to Robert and Dorothy Wilkie in 1986, which is land that the Melvilles argue constitute a part of the Harris parcel, because of the metes and bounds description for that parcel, and the description of that land as a part of the Portas property in the deed was erroneous. *See* D.I. 21, at A-056 - A-057; D.I. 24, at 8.

There appears to be no deed of record between Davis and Gibbs evidencing the transfer of land pursuant to their contract in 1907, nor any record of subsequent conveyances of the Gibbs parcel until a quitclaim deed, recorded on July 11, 1992, was executed by Rachel Brown, an heir of Gibbs, which conveyed 11 acres "more or less" that was described in the Portas Deed as "contracted to be sold to Williams Gibbs on September 12, 1907."[24]

Over the intervening years, ownership in the Portas property passed through several hands before N.E. purchased it in 1967 and sold it to the Melvilles in three separate conveyances of 13.35 acres "more or less" in 1973, 92.08 "+/-" acres in 2012, and 3.6 acres "more or less" in 2013.[25]

Here, Szelestei claims title to the Gibbs parcel, which encompasses the Disputed Parcel, through the 1992 deed. She asserts that Gibbs obtained ownership of the Gibbs parcel in 1907 from Clark. Although she acknowledges there is no deed of record conveying the Gibbs parcel between Clark and Gibbs, she relies on the reference to "this conveyance" in the Portas Deed, as well as the

---

[24] D.I. 21, at A-017 - A-018.

[25] D.I. 7, Ex. 4, Ex. 1. The 2013 transfer occurred after Kent County advised that in mapping the parcel the Melvilles purchased in 2012 for tax purposes, a landlocked parcel of 3.6 acres remained (which the Melvilles assert corresponds in location with the Disputed Parcel). D.I. 24, at 12-13. N.E. then executed a quitclaim deed to the Melvilles, which was recorded on January 24, 2013, for 3.6 acres "more or less" to reflect that N.E. intended to convey its entire ownership interest to the Melvilles. *Id.* at 13.

monuments and markers, and its different physical attributes (including the size of the trees on the Gibbs parcel) from the adjoining parcels, to support her claim. She further asserts that the Portas Deed shows that the Gibbs parcel was separate from, and not included in, the Portas property, so the Melvilles have no ownership claim to the Gibbs parcel.[26]

The Melvilles respond that they obtained title to the Disputed Parcel through the Portas chain of title and, since there is no evidence that the sale of property between Clark and Gibbs was ever completed, Szelestei has no rights to the Disputed Parcel. They assert, even if the sale occurred, the Gibbs parcel was limited to 11 acres by the deed (the acreage was not termed "more or less") so the Disputed Parcel's "extra" 3.6 acres would be conveyed to them through the Portas chain of title, which encompassed 112 acres "more or less." And, they conclude that Szelestei incorrectly relies on stone monuments to show corner boundaries of the Gibbs parcel.

To grant Szelestei's motion for summary judgment, I must find that she is entitled to judgment as a matter of law and that there are no material issues of fact in dispute. After reviewing the arguments and materials provided by the parties, I find that ownership in the Disputed Parcel, at this juncture, is, as the saying goes,

---

[26] D.I. 21, at 28-29.

"clear as mud." The purpose of this action is to determine ownership of the Gibbs parcel, which incorporates the Disputed Parcel. To do so, I look at the strength of Szelestei's title to the Gibbs parcel overall and, because of Szelestei's and the Melvilles' competing ownership claims for the Disputed Parcel, at the strength of each party's title to the Disputed Parcel.

The uncertainty starts with the lack of clear evidence concerning the conveyance of the Gibbs parcel from Clark to Gibbs. Szelestei points to a reference to a contract between Clark and Gibbs for the sale of the Gibbs parcel in the Portas Deed, but that deed transfers ownership of a different piece of property and does not portend to convey any rights to the Gibbs parcel. That language in the Portas Deed does show Clark's intent to sell the Gibbs parcel to Gibbs under the contract previously entered into, but there is no evidence before me indicating that the Gibbs parcel was eventually sold to Gibbs. The Portas Deed, through its language excepting the Gibbs parcel from lands transferred to the Portases, eliminates any claim that those in the Portas chain of title, including the Melvilles, have to the Gibbs parcel. Szelestei relies on the 1992 deed conveying the Gibbs parcel to her from the Gibbs Estate to demonstrate her ownership of the Gibbs parcel. The problem is that the Gibbs Estate can only convey what land it owned

and there must be sufficient evidence of its ownership of the Gibbs parcel for it to convey good title.

The Melvilles argue that the Gibbs parcel was never conveyed to Gibbs. But, they claim, more importantly, the Disputed Parcel was not part of the Gibbs parcel but was unassigned land (which they learned about in 2012 through the tax mapping process performed by Kent County), that flowed to them through the Portas Deed. They base their claim, in part, on a recent survey and through their review of the relevant deed descriptions. The Portas Deed transferred all of Clark's property, except for three parcels of land that were excepted (the Vanderveldt, Gibbs and Harris parcels), to the Portases. The Portas property was described as 112 acres "more or less," while the descriptions of the parcels that were excepted referred to a specific acreage only (did not include the language "more or less." So, the Melvilles conclude the unassigned 3.6 acres were not included in the other parcels because their size was defined without flexibility, and they fell within the Portases' acreage.[27] This argument runs contrary to Szelestei's claim that the 1992 Deed needs to be reformed to reflect that, according to her 1993 survey, the Gibbs parcel was actually 13.55 acres, not 11 acres. And, without

---

[27] *See generally Pryde v. Delmarva Power & Light Co.*, 2009 WL 388942, at \*4 (Feb. 17, 2009) ("When employed in a grant or deed to modify a quantity term, the phrase "more or less" will account for only minor inaccuracies in measurement.").

further discussion, it does not address the discrepancy in the acreage eventually

conveyed to Harris, which was 18 acres and not 15 as described in the Portas Deed.

There is a lack of clarity in the deed descriptions for the Gibbs parcel and

other neighboring properties, with calls based primarily on adjoiners until

relatively recently, and the competing parties relying on differing theories to

support their claims of ownership.[28]  I find that, at this stage of the proceedings,

there are unresolved material issues about the ownership of the Gibbs parcel and

the Disputed Parcel, and further inquiry into the facts is warranted, in order to

clarify the application of law to the circumstances.

Further, Szelestei alleges that monuments (two stones, a pipe and an axle),

as depicted in her 1993 survey, show the corner boundaries of her property, the

Gibbs parcel.  The Melvilles dispute Szelestei's conclusions, arguing that the stone

monuments Szelestei claims show two corner boundaries of the Gibbs Parcel were,

instead, intended to depict deviations in course of the Melvilles' adjoining

---

[28] The first deed of any neighboring property to include a description based on courses
and distances (from a survey) was the 1973 conveyance of 13.55 acres between N.E. and
the Melvilles. *See* D.I. 7, Ex. 4.  The first survey of the Gibbs parcel showed monuments
and courses and distances, and was completed in 1993; however, the recorded deeds of
the Gibbs parcel and the Disputed Parcel depict calls only to adjoiners, acreage, and, in
2013, by reference to a tax parcel number. *Id.*, at A-022; A-017 - A-018; A-032 - A-033.

14

properties.  Many ambiguities remain, based upon the relevant deeds, and claims as to the significance of monuments, which are not included in the relevant deeds.[29]

## IV.  Conclusion

Based upon the reasons set forth above, I find that Szelestei has not met her burden of demonstrating that no material issues of fact are in dispute and that she is entitled to judgment as a matter of law, and that it is desirable to inquire more thoroughly into the facts in this matter.  Accordingly, I recommend that the Court deny Szelestei's motion for summary judgment.  This is a Master's final report and exceptions may be taken under Court of Chancery Rule 144.

Respectfully,

/s/ Patricia W. Griffin

Patricia W. Griffin
Master in Chancery

---

[29] In their answering brief, the Melvilles discuss considerations presented in a December 17, 2010 surveyor's report by William A. Elliott ("Elliott").  Szelestei has filed a motion in limine to preclude Elliott's report and testimony at trial.  I will address that motion separately, and did not rely on findings in that report in making this decision.