# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LEON TREHERNE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0854-PWG |
| | ) | |
| FORSIGHT, LLC, a Delaware Limited | ) | |
| Liability company, RONALD E. | ) | |
| HASTINGS, and CYNTHIA R. | ) | |
| HASTINGS, | ) | |
| | ) | |
| Defendants | ) | |

## MASTER'S REPORT

Date Submitted:  February 11, 2022
Final Report:  June 6, 2022

Dean A. Campbell, Esq., LAW OFFICES OF DEAN A. CAMPBELL, P.A., Milton, Delaware, *Attorney for Plaintiff*

Ronald E. Hastings, Ponte Vedra Beach, Florida, *Pro Se*

Cynthia R. Hastings, Ponte Vedra Beach, Florida, *Pro Se*

**GRIFFIN, M.**

Pending before me is a petition to quiet title by adverse possession. The property at issue is a small, landlocked parcel of land with a church building outside of Seaford, Delaware. A pastor had purchased a parcel of land adjacent to the church property in 1963 and, thinking he had also purchased the church property, began operating a church on the church property beginning in 1970. In 1995, Petitioner's father began renting the property from the pastor and using the church property for his congregation, and then later bought the property from the pastor. In 2011, petitioner inherited his father's interest in the property and claims ownership of the church property by adverse possession. A developer claims ownership of the church property, tracing his title to deeds between himself and family members from the 1970s. The developer claims that petitioner's possession is permissive and that he and the original pastor reached an arrangement in 1980, by which that pastor could use the land and church without paying rent. I find that petitioner proved that he and his predecessors in interest adversely possessed the church property for over 20 years, and that the developer failed to prove that their use was permissive. This is a final report.

# I. BACKGROUND[1]

### A. Factual Background

At dispute is a parcel of land containing approximately 26,148 square feet, more or less ("Disputed Land"), which is improved by one building ("Church").[2] On October 26, 1963, Howard Lane, Jr. ("Lane") conveyed land ("1963 Tract") to Edward Holley ("Holley") described as:

> Beginning at a point in the northern right-of-way line of the said private road which is approximately 200 feet west of the said Route 516; thence with the line of the said private road in a westerly direction two hundred (200) feet to a stake; thence at right angles in a southerly direction One Hundred Fifty (150) feet; thence in an easterly direction two hundred (200) feet; thence in a northerly direction one hundred fifty (150) feet to the said private road, the point of beginning, and containing 30000 square feet of land, more or less.[3]

On or before 1970, Holley began operating the Solidrock Apostolic Church of the Lord Jesus Christ ("Solidrock") on the Disputed Land, which is adjacent to the 1963 Tract.[4]  On August 15, 1978, Holley and his wife conveyed property described similarly to the 1963 Tract to Solidrock, with the condition that "[i]n the event that this property shall at any time be used for other than church purposes, … the grantors

---

[1] I refer to the transcript of the December 14, 2021 evidentiary hearing as "Trial Tr."  I refer to the Plaintiff's Trial Exhibits as "Pl.'s Tr. Ex."  I refer to the Defendants' Trial Exhibits as "Defs.' Tr. Ex."  I refer to the Docket Items as "D.I."

[2] D.I. 1, ¶¶ 13, 14;

[3] Defs.' Tr. Ex. 8.  The 1963 Tract is identified as Tax Parcel 2-31-12.00-161.00. *See* Pl.'s Tr. Ex. 7.

[4] Trial Tr. 192:18-193:9; *id*. 214:24-215:2; *see also id.* 19:8-12.

… may reenter and take possession …"[5] On August 24, 1978, Defendant Ronald E. Hastings ("Hastings") and his mother deeded contiguous land to the east of the 1963 Tract (containing 27,000 square feet more or less) to Holley ("1978 Tract").[6] Holley continued to use and maintain the Church and Disputed Land through the 1980s and into the early 1990s.[7] He put a sign for the Church out by the road when he moved onto the Disputed Land.[8] On February 13, 1997, Holley conveyed the 1978 Tract to his son, John Rhodes, Jr. ("Rhodes"),[9] and on March 26, 1997, Holley, individually and on behalf of Solidrock, conveyed the 1963 Tract to Rhodes, and also executed a quitclaim deed and conveyed any possibility of reverter to Rhodes.[10]

---

[5] Defs.' Tr. Ex. 10.

[6] Defs.' Tr. Ex. 11. The 1978 Tract is identified as Tax Parcel 2-31-12.00-160.01. *See* Defs.' Tr. Ex. 16. Hastings testified that he and his mother had "entered into the agreement in 1978 to deed that property to [Holley]." Trial Tr. 215:6-8. The 1978 Tract was part of the lands conveyed to Hastings' mother on April 19, 1976 (Parcel 2). *Id.*; Defs.' Tr. Ex. 4. Holley deeded the 1978 Tract to create a tenancy by the entirety with his wife on October 19, 1978. Defs.' Tr. Ex. 12.

[7] Trial Tr. 211:10-12. Solidrock obtained building permits related to the roof on the Church in 1990, 1991 and 1993. Pl.'s Tr. Ex. 11. Hastings testified that Holley added an office extension between 1989 and 1991. Trial Tr. 197:22-23.

[8] Trial Tr. 215:20-22.

[9] Defs.' Tr. Ex. 13. Holley's wife had predeceased him.

[10] Pl.'s Tr. Ex. 2; Defs.' Tr. Ex. 14; Defs.' Tr. Ex. 15.

Amos Treherne ("Amos") began renting the Church and Disputed Land from Holley in 1995,[11] and operated the Church as the Pentecostal House of Prayer ("Pentecostal").[12] On March 7, 2002, Holley and Rhodes conveyed both the 1963 Tract and the 1978 Tract to Amos.[13] When Amos died in 2011, Plaintiff Leon Treherne ("Treherne") inherited Amos' rights to the Holley Tract through intestate succession.[14] Amos made improvements to the Church and Disputed Land beginning in 1996 through 2011, including rebuilding the inside of the Church (made a pulpit, bought pews and installed a sound system, built a new kitchen, created an office), installing on a new roof in 2002, repairing the Church's cesspool, putting in a light post, and maintaining the property by trimming and cutting down trees and cutting the grass.[15] He put a sign up for Pentecostal on Holley Road, which directs access to the Church and the Disputed Land from Route 516.[16] After Amos' passing,

---

[11] Trial Tr. 18:3-4. Leon Treherne testified that the agreement was to rent with the option to buy. *Id.* 22:1-6; *id.* 55:5-7. I use first names in pursuit of clarity and intend no familiarity or disrespect.

[12] *Id.* 19:3-7; *id.* 21:2-5.

[13] Defs.' Tr. Ex. 16. Amos executed a purchase money mortgage for the properties on March 7, 2002 payable to Rhodes. D.I. 41, Ex. A. There was a mortgage modification dated April 16, 2016, and a mortgage satisfaction that was dated July 24, 2017 and recorded. *Id.*, Exs. B, C.

[14] Pl.'s Tr. Ex. 6; Pl.'s Tr. Ex. 7.

[15] Trial Tr. 23:1-2; *id.* 27:6-8; *id.* 34:2-7; *id.* 39:1-9; *id.* 40:20-41:5; Pl.'s Tr. Ex. 11 (building permit to replace the roof issued to Amos as owner of the property in 2002); Trial Tr. 41:12-42:6; *id.* 42:19-24.

[16] Trial Tr. 53:22-54:7.

Treherne continued to make improvements and repairs to the Church and the Disputed Land by building a sound room, fixing roof leaks and the floor, installing a security system for the Church, and making sure the grass was cut.[17]

After Amos' death, the Church continued to be operated as Pentecostal by Sharon and Jerome Cannon ("Cannons").[18] On January 13, 2012, Treherne sued the Cannons in the Justice of the Peace Court, which found that there had never been a landlord tenant relationship between Treherne and the Cannons' church.[19] From May of 2012 through December of 2017, Dolley Cannon-Pitts and Jessie Pitts ("Pitts"), operating as Harvest Time Ministries, leased the Church from Treherne and regularly paid $600 per month in rent.[20] During that time, the Pitts performed regular maintenance (cutting grass, taking care of the building) on the Church and the Disputed Land.[21] In January of 2018, Hastings contacted the Pitts, claiming ownership of the Church and instructed them to stop paying rent to Treherne.[22] They

---

[17] *Id.* 46:14-47:1; *id.* 49:1-11; *id.* 70:14-18.

[18] *Id.* 44:23-45:9.

[19] *See Est. of Treherne v. Cannon*, C.A. No. S14J-03-070 (Del. Super.). I take judicial notice of the procedural history and the holdings in this transfer of judgment from the Justice of the Peace Court to the Superior Court. I do not rely upon the findings of fact contained therein. *See* D.R.E. 201.

[20] Pl.'s Tr. Ex. 12; Pl.'s Tr. Ex. 13; *see also* Trial Tr. 144:12-24; *id.* 145:1-8.

[21] Trial Tr. 145:9-15.

[22] *Id.* 147:23-148:18. Jessie Pitts testified that Hastings offered to rent the Church to the Pitts but they declined because they were only going to pay rent to "the one who gave us the key" (Treherne). *Id.* 149:5-15.

continued to hold services in the Church with Hastings' permission until the Church's condition deteriorated so that it was unsafe.[23]  Hastings' actions led to the present dispute.[24]

B.      *Procedural History*

Treherne filed a petition seeking adverse possession, quiet title and implied or prescriptive easement rights ("Petition") on November 26, 2018.[25]  The Petition named Forsight, LLC ("Forsight"), Helen Mae Washington, and Bridget G. Washington as defendants and Jerry C. And Candy L. Harris, Andre H. Burbage and Dawn Jones Burbage as defendants "for notice purposes only" (collectively, except Forsight, "Individual Defendants").[26]  Forsight, Andre H. Burbage, Dawn Burbage, Jerry C. Harris, and Candy L. Harris were served on or before December 12, 2018.[27]  Hastings and Cynthia R. Hastings ("Cynthia") filed an answer ("Answer") on January 23, 2019.[28]  On February 4, 2019, Treherne moved to strike the Answer, arguing that Hastings and Cynthia had no interest in the Disputed Land.[29]

---

[23] *Id.* 66:23-67:5; *id.* 155:14-156:6 (roof leaks caused mold in the ceiling).

[24] *See* Defs.' Tr. Ex. 29.

[25] D.I. 1.

[26] *Id.*

[27] D.I. 4.  The sheriff returned a non-est for Bridget G. Washington and Helen Mae Washington. *Id.*

[28] D.I. 9.

[29] D.I. 10.

On February 26, 2019, the Court granted the motion to strike the Answer, ordering Forsight to appear through Delaware counsel.[30] On March 4, 2019, the Court received Hastings' response to the motion to strike the Answer.[31] On March 5, 2019, the Court received a letter from Hastings, in which he contended that Forsight had no interest in the Disputed Land and that he was the true party in interest.[32] On March 19, 2019, the Court vacated its February 26, 2019 order striking the Answer and joined Hastings and Cynthia as parties to the action.[33]

On May 13, 2019, Treherne filed a motion for default judgment against Forsight.[34] Following a hearing, the Court entered default judgment against Forsight on September 4, 2019.[35] Treherne dismissed the Individual Defendants on February 26, 2020.[36] There was an evidentiary hearing in this matter on December 14, 2021 by Zoom.[37] Following the evidentiary hearing, the parties submitted simultaneous written closing arguments on February 11, 2022.[38]

---

[30] D.I. 11.

[31] D.I. 12.

[32] D.I. 13.

[33] D.I. 16.

[34] D.I. 17.

[35] D.I. 26; D.I. 25.

[36] D.I. 27.

[37] D.I. 42.

[38] D.I. 44; D.I. 45.

## II. ANALYSIS

### A. *Parties' Contentions*

Treherne argues that he and his predecessors in interest—Amos, Rhodes, and Holley—established title by adverse possession to the Disputed Land.[39] He asserts that, from at least 1978, the Disputed Land and Church was used in a sufficiently open, notorious, and hostile manner as to put the record owner on notice of the claim by adverse possession.[40] Treherne also contends that Hastings has no current interest in the Disputed Land.[41] Hastings responds that Treherne cannot prove adverse possession because the use of the Disputed Land was not open and notorious, exclusive or continuous, and it was always permissive.[42]

### B. *Record Ownership*

As a threshold matter, the parties dispute who holds legal title to the Disputed Land. Treherne contends that Forsight holds legal title to the Disputed Land,[43] while Hastings contends that he holds legal title to the Disputed Land.[44] If Hastings has

---

[39] D.I. 44, at 8-10.

[40] *Id.*

[41] D.I. 33, at 2-3.

[42] D.I. 45, at 1-2, 7-10.

[43] D.I. 33, at 2-3.

[44] D.I. 45, at 9-10.

no interest in the Disputed Land, he has no standing here to raise a defense to the quiet title action.[45]

The standard for proving legal title is preponderance of the evidence.[46]  The "construction of a deed is a question of law upon which the court must rule."[47]  "The fundamental rule in construing a deed is to ascertain and give effect to the intent of the parties as reflected in the language they selected."[48]  The "scope and extent of a grant [of land] contained in a deed depends upon the meaning of the language of the deed, and where that language contains ambiguities the deed must be read in the light of the intent of the parties as determined by the facts and circumstances surrounding the transaction."[49]

---

[45] *See Jackson v. Wax*, 171 A. 755, 756 (Del. Ch. 1934) ("[A] bill to quiet title may be brought by a complainant who claims in good faith a title by adverse possession *against the holder of record title*.") (emphasis added); *see also David v. Steller*, 269 A.2d 203, 204 (Del. 1970); *Scureman v. Judge*, 626 A.2d 5, 12 (Del. Ch. 1992).

[46] *See ABC Woodlands, LLC v. Shreppler*, 2012 WL 3711085, at *2 (Del. Ch. Aug. 15, 2012) (citing *Doe v. Roe*, 80 A. 352, 354 (Del. Super. 1911)); *see also State v. Sweetwater Point, LLC* [hereinafter *Sweetwater Point*], 2017 WL 2257377, at *8 (Del. Ch. May 23, 2017).

[47] *Rohner v. Niemann*, 380 A.2d 549, 552 (Del. 1977) (citation omitted); *see also Smith v. Smith*, 622 A.2d 642, 645 (Del. 1993).

[48] *Smith*, 622 A.2d at 646 (citing *Rohner*, 380 A.2d at 552); *see also Phillips v. State, ex rel. Dep't of Nat. Res. & Envtl. Control*, 449 A.2d 250, 253 (Del. 1982) (citations omitted); *Sweetwater Point*, 2017 WL 2257377, at *8.

[49] *Rohner*, 380 A.2d at 552.

The claim that Forsight owns the Disputed Land stems from a February 4, 2013 deed ("2013 Deed") conveying property from Hastings to Forsight which is described, in relevant part, as "Parcel 2: (2-31-12.00-156.00)" and as

> All that certain tract, piece and parcel of land situate, lying and being in Nanticoke Hundred, Sussex County, Delaware situated on the West side of County Road 516 bounded by lands now or formerly of James Clayton and Isaac Clayton to the North and on the South by lands now or formerly of Howard F. Lane, containing 9.55 acres, more or less, and *being Parcel 8 from a Deed from Norman E. Hastings to Ronald E. Hastings dated December 14, 1979, which is of record ... in Deed Book 987 at Page 236 et seq.*"[50]

Parcel 8 can be traced back through deeds to lands conveyed to Howard F. Lane, Howard Lane, Jr. ("Lane")'s father through a monitions sale.[51] Hastings argues that only Parcel 8 was transferred to Forsight in the 2013 Deed and the Disputed Land is contained within other lands he continues to own that were originally conveyed to Lane by Harold E.B. Matthews and others ("Matthews Tract") on February 9, 1942.[52] Lane deeded small parcels of the Matthews Tract to Holley and to the

---

[50] Defs.' Tr. Ex. 1 (emphasis added).

[51] Defs.' Tr. Ex. 2 (Parcel 8 in the deed dated December 14, 1979 and recorded in Deed Book ("D.B.") 987, Page ("P.") 237, contains the same description as the 2013 Deed and states it is part of the land conveyed through a deed dated April 19, 1976 ("1976 Deed") and recorded in D.B. 800, P. 106); Defs.' Tr. Ex. 4 (Parcel 9 in the 1976 Deed, which is found at D.B. 800, P. 109, contains the same description as in the 2013 Deed and contains lands that were conveyed to "Howard F. Lane by John S. Isaacs, Receiver of Taxes and being of record in the Office of the Recorder of Deed, Georgetown, Delaware, in Deed Book 297, page 4").

[52] *See* Trial Tr. 227:17-228:11; Defs.' Tr. Ex. 8; Defs.' Tr. Ex. 4 ("Parcel 2").

Washington family.[53] By December 14, 1979, through estate administrations and intra-family transactions, Hastings consolidated ownership in the remaining portion of the Matthews Tract, which was described as:

> All the rest, residue and remainder of land, lying and being in Nanticoke Hundred, located on the West side of County Road 516, adjoining lands now or formerly of Charles Washington, Edward Holley, Charles L. Harris, Mary Stewart, other lands of the Grantors and Grantees, and others, containing 22.83 acres, more or less.[54]

On October 29, 1985, Hastings executed a deed ("1985 Deed") to himself "for the purpose of forming one parcel out of the remainder of Tax Parcel 2-31-12-160 and Tax Parcel 2-31-12-156 Sussex County."[55] The 1985 Deed appears to include Hastings' lands designated as separate parcels in prior deeds and specifically states that the lands being transferred are bounded on the east by "lands now or formerly of [Solidrock]; lands now or formerly of [Holley]."[56] Since the Disputed Land is immediately adjacent to the west of the 1963 Tract (lands owned by Holley, then Solidrock), I find that it is included in the portion of the Matthews Tract owned by Hastings that was transferred into Tax Parcel 2-31-12.00-156.00 ("Tax Parcel 156") by the 1985 Deed.

---

[53] *See* Defs.' Tr. Ex. 6; Defs.' Tr. Ex. 8.

[54] Defs.' Tr. Ex. 2 (Parcel 1). *See* Defs.' Tr. Ex. 4 (Parcel 2); Defs.' Tr. Ex. 3 (Parcel 1); Defs.' Tr. Ex. 2 (Parcel 1).

[55] Defs.' Tr. Ex. 17.

[56] *Id.*

12

However, the issue is whether the 2013 Deed transferred all lands in Tax Parcel 156 into Forsight, including the Disputed Parcel, or only part of those lands – Parcel 8. The 2013 Deed is ambiguous because the heading for Parcel 2 notes the tax parcel number without any limitation (i.e., no P/O to signify part of), while the description of the land limits the transfer to Parcel 8 only. So, it can be read as either conveying only Parcel 8 or all of the lands transferred into Tax Parcel 156 by the 1985 Deed. Where there are ambiguities, deeds are read in light of the parties' intent, considering the facts and circumstances surrounding the transaction.[57] Hastings, the grantor, testified that the intent of the deed was to transfer only Parcel 8 and no other parcels.[58] His testimony is consistent with the description of Parcel 8 as the only land being transferred to Forsight in the 2013 Deed.[59] Thus, I conclude that Hastings has provided sufficient evidence that he is the record owner of the Disputed Land and has standing to raise a defense to this action.[60]

---

[57] *See Rohner v. Niemann*, 380 A.2d 549, 552 (Del. 1977).

[58] Trial Tr. 234:13-15. There is no evidence of Forsight's intent. However, since Forsight's mailing address for property tax purposes is Hastings' Florida address, I presume that Hastings has some relationship with Forsight. *Compare* Defs.' Tr. Ex. 38 *with* Defs.' Tr. Ex. 1.

[59] *But see* Defs.' Tr. Ex. 38 (Sussex County lists Forsight as owner of all of Tax Parcel 156 for property tax purposes).

[60] There was some confusion whether Cynthia has an ownership interest in the Disputed Land. *See* D.I. 9 (Cynthia responded to the Petition); D.I. 45, at 10 (Cynthia signed the post-trial brief); *but see* Pl.'s Tr. Ex. 16, App. I (#14 Answer). None of the deeds through which Hastings obtained ownership of the Disputed Land mention Cynthia, or "and wife"

*C.    Adverse Possession*

To establish title by adverse possession Treherne must show, by a preponderance of the evidence, open and notorious, hostile and adverse, exclusive, actual possession of the Disputed Land, that was continuous for twenty years.[61] "[A] party claiming title or rights by adverse possession or use has the burden of proving all the elements of an adverse holding[.]"[62] Once that burden is met, it is incumbent on the holder of record title – Hastings – "to establish that the possession or use was permissive."[63]

1.  Open and Notorious, Actual, and Exclusive Possession

Hastings contends that the use of the Disputed Land was not open and notorious, as there were no "No Trespassing" signs, fencing or barriers erected on the Disputed Land, and he entered onto the Disputed Land and had his employees on the property, during the period of adverse possession.[64]

"Open and notorious means that the possession must be public so that the owner and others have notice of the possession. If possession was taken furtively or

---

or "et ux." *See* Defs.' Tr. Ex. 17; Defs.' Tr. Ex. 3; Defs.' Tr. Ex. 4. Therefore, there is no evidence that Cynthia has an ownership interest in the Disputed Land.

[61] *Tumulty v. Schreppler* [hereinafter "*Tumulty*"], 132 A.3d 4, 24 (Del. Ch. 2015).

[62] *David v. Steller*, 269 A.2d 203, 204 (Del. 1970) (citations omitted).

[63] *Id*. (citations omitted).

[64] D.I. 45, at 7-8.

14

secretly, it would not be adverse and no title possession could be acquired."[65] The issue of open and notorious possession "depends upon the particular land in question."[66] "The requirement of actual possession overlaps to a large extent with open and notorious possession."[67] The inquiry is whether "the possession comports with the usual management of similar lands by their owners."[68] "Neither the actual occupation, cultivation, nor residence is necessary where neither the situation of the property nor the use to which it is adapted or applied admits of, or requires, such evidence of ownership."[69] "The exclusivity element does not require absolute exclusivity,"[70] but that the adverse possessor "show exclusive dominion over the land and an appropriation of it to his or her benefit."[71]

I find that Treherne has proven each of these elements by a preponderance of evidence. Treherne proved open and notorious possession of the Disputed Land because he, his predecessors in interest, and their agents used the Disputed Land and Church openly. Since at least the 1970s, there has been a sign on the main road

---

[65] *Tumulty*, 132 A.3d at 27 (quoting *Walker v. Five N. Corp.*, 2007 WL 2473278, at *4 (Del. Ch. Aug. 31, 2007)) (internal quotation marks and citations omitted).

[66] *Id*. (citations omitted).

[67] *Id*. at 30.

[68] *Id*. (quoting *Marvel v. Barley Mill Road Homes*, 104 A.2d 908, 912 (Del. Ch. 1954)).

[69] *Id*. (quoting *Marvel*, 104 A.2d at 912) (emphasis omitted).

[70] *Tumulty*, 132 A.3d at 26.

[71] *Id*. (quoting *Walker v. Five N. Corp.*, 2007 WL 2473278, at *4 (Del. Ch. Aug. 31, 2007)) (internal quotation marks omitted).

advertising the Church's presence.[72] For over 50 years, Holley, Amos, and Treherne have made improvements and repairs to the Church and Disputed Land, including installing new roofs and making roof repairs, putting in a light post, rebuilding the inside of the Church (made a pulpit, built an office, new kitchen and sound room, bought pews and installed a sound system and security system, built a new kitchen, created an office), repairing the Church's cesspool, and maintaining the property by trimming and cutting down trees and cutting the grass.[73] Even though the Church was typically empty most of the week,[74] this is consistent with the use of the Disputed Land as a Church, and maintenance was performed on other days. Importantly, the use, occupation, and improvement of the Disputed Land and Church for religious purposes was not furtive or secret,[75] and it was sufficient to put a record owner on notice that the Disputed Land and the Church were being used. Thus, Treherne proved open and notorious possession by a preponderance of the evidence.

Treherne proved actual possession of the Disputed Land because he, his predecessors in interest, and their agents used the Disputed Land and Church for religious purposes. Holley, Amos, and Treherne made improvements and repairs to

---

[72] Trial Tr. 215:20-22; *see also id.* 54:1-7.

[73] *See supra* notes 7, 15 and 17, and accompanying text.

[74] Trial Tr. 186:11-12.

[75] *See Tumulty*, 132 A.3d at 27-28.

the Church and Disputed Land,[76] and they or their agents consistently conducted religious services in the Church between 1980 (when Holley began using the Disputed Land) through 1995 (when Amos started renting) and 2017 (when Hastings sought to oust Treherne from the Disputed Land).[77]

Treherne proved exclusive possession over the Disputed Land because he and his predecessors in interest appropriated it to their benefit by charging rent[78] and making repairs and additions to the Church.[79] Although Hastings' argues that Treherne cannot show exclusive possession because Hastings and others went onto the Disputed Land during the adverse period and Treherne and Amos failed to install fencing or "no trespassing" signs,[80] this does not defeat a showing of exclusive possession. "[F]ences are not required for a successful adverse possession claim," especially where construction of a fence "would have been difficult."[81] Here, fencing across Holley Lane to keep others out would have interfered with other landowners' access to their properties[82] and erecting barriers to prevent entry onto

---

[76] *See supra* notes 7, 15 and 17, and accompanying text.

[77] Trial Tr. 17:12-20; *id.* 55:10-11; *Id.* 44:23-45:9; *id.* 145:1-8; *id.* 155:22-156:6.

[78] *See* Pl.'s Tr. Ex. 12; Pl.'s Tr. Ex. 13; Trial Tr. 144:12-24; *id.* 18:3-4 (Amos paying rent to Holley).

[79] Trial Tr. 40:19-42:9; *id.* 34:1-7; *id.* 35:3-5; *id.* 42:2-6.

[80] D.I. 45, at 7-9.

[81] *Tumulty*, 132 A.3d 4, 28 (Del. Ch. 2015).

[82] Trial Tr. 121:20-23.

church property to show exclusivity (fencing, "No Trespassing" signs) seems antithetical to a church's purpose of encouraging people to come to the church to worship. Further, where others pass onto lands irregularly and temporarily, a court may still find an exclusive possession sufficient to support adverse possession.[83]

Looking at the relevant period for Treherne's claim of adverse possession, the evidence shows that, since Hastings moved in Florida in 1997 or 1998,[84] Hastings and/or Cynthia very infrequently visited the Disputed Land (once in 2000, in 2005 and in 2017).[85] Hastings testified that his employee, Herman Williams ("Williams"), checked the Disputed Land "quite often," "did most of the plumbing," and "several times did maintenance procedures around the [Disputed Land]," including a time Williams repaired the water pump "sometime before 2006," and also the septic system, but provided no more specific proof.[86] Cynthia testified that, around 2000, Williams fixed Holley Lane, removed trash around the Church and closed the impassable dirt road that ran from the back of the Disputed Land to their

---

[83] *Tumulty*, 132 A.3d at 26-27.

[84] Trial Tr. at 165:12-13.

[85] *Id.* 166:6:11; *id.* 169:19-21; *id.* 173:23-174:21. Although Hastings testified that he "visited the [Disputed Land] often," *id.* 199:11-14, his specific descriptions of his contacts with the Disputed Land show that he visited it irregularly.

[86] *Id.* 197:24-198:1; *id.* 200:1-20.

development.[87] She further testified that, in 2005, Williams worked on Holley Lane again and she entered the Church with him at that time.[88] Hastings and Cynthia testified that, in 2017, they drove by the Church and noticed the ground had been disturbed for what appeared to be a septic system, which is what "began this lawsuit."[89]

The evidence showed that Williams actually attended the Church at one time[90] and Hastings testified that Williams "had full access to the [Church] because he did work for Mr. Holley on his own."[91] Treherne and his agents had a key to the Church, but Hastings did not.[92] I do not find sufficient evidence to conclude that the infrequent work Williams performed on the Disputed Land or the Church was sufficient to show that Holley, Amos or Treherne were not in possession of the Disputed Land (at least until the dispute in 2017 that led to this action), especially given that Williams also worked for Holley.[93]

---

[87] *Id.* 170:1-171:22. Cynthia testified Williams was making the improvements because "you could see through the tree line from [their development] to the back of the property." *Id.* 170:22-171:3.

[88] *Id.* 172:19-173:11 (Herman let Cynthia into the Church).

[89] *Id.* 174:8-18; *id.* 202:12-23.

[90] *Id.* 196:23-197:2.

[91] *Id.* 200:23-24.

[92] *Id*. 137:17-19*; id.* 149:19-150:1;

[93] Further, Williams' work on Holley Lane benefitted all of the properties that used the road, not just the Disputed Land. *See id.* 121:16-23 (Treherne's testimony that he "couldn't block the road [otherwise the people who lived back there] couldn't get to their home").

## 2. Hostile Possession

"A use is adverse or hostile if it is inconsistent with the rights of the owner."[94] Or, "[h]ostile means against the claim of ownership of all others, including the record owner."[95]  "It is not necessary that one entering a property must expressly declare his intention to take and hold the property as his own.  The actual entry upon and the use of the premises as if it were his own, to the exclusion of all others, is sufficient."[96] The adverse possessor must prove that the use was adverse to the rights of the record holder.[97]

Treherne has established that his use and the use of his predecessors-in-interest was adverse since at least 1995, when Amos first rented the Disputed Land from Holley, who held himself out as the true owner of the Disputed Land.[98]  In 1997, when Holley conveyed his property interests to Rhodes, Rhodes held himself out as the true owner of the Disputed Land and the Church, continuing the rental agreement with Amos, including the option to purchase the Disputed Land.[99]  After

---

[94] *Berger v. Colonial Parking, Inc.*, 1993 WL 208761, at *4 (Del. Ch. June 9, 1993).

[95] *Bogia v. Kleiner*, 2019 WL 3761647, at *10 (Del. Ch. Aug. 8, 2019) (citations and quotation marks omitted) (alteration in original).

[96] *Tumulty*, 132 A.3d 4, 27 (Del. Ch. 2015) (cleaned up).

[97] *See David v. Steller*, 269 A.2d 203, 204 (Del. 1970).

[98] Trial Tr. 18:3-4.  As part of the rental agreement between Amos and Holley, Amos had the option to purchase the Disputed Land and the Church. *Id*. 22:4-6; *id*. 55-5-7.

[99] *Id*. 22:4; *id*. 140:19-24.

20

Amos believed he had purchased record ownership to the Church and Disputed Land, he made improvements to the Church. After Amos' death, Treherne held himself out as the true owner of the Disputed Land and Church, and brought legal action to vindicate his rights to the Disputed Land against other persons who claimed an interest in it.[100] Treherne held himself out as the true owner of the Disputed Land and Church, leasing the Church and making improvements to the Church.[101] The evidence shows that Treherne and his predecessors in interest made "use of the [Disputed Land] as if it were [their] own."[102] Thus, Treherne has established hostile possession.

### 3. Continuous Possession

The twenty-year continuous possession requirement "is a bright-line inquiry."[103] "In order to make up the prescriptive period, successive adverse users by different persons may be tacked [or added together], but there must be privity between such persons."[104] The doctrine of tacking may be invoked where the

---

[100] *See supra* note 19. When Treherne prepared an inventory for Amos' estate, he included the Disputed Land as part of the estate's property. *See* Pl.'s Tr. Ex. 7.

[101] Pl.'s Tr. Ex. 12; Pl.'s Tr. Ex. 13; Trial Tr. 144:12-24; *id*. 46:14-47:1; *id*. 107:3-17.

[102] *Tumulty*, 132 A.3d 4, 27 (Del. Ch. 2015) (internal quotation marks and citation omitted).

[103] *Id.* at 24.

[104] *Berger v. Colonial Parking, Inc.*, 1993 WL 208761, at *5 (Del. Ch. June 9, 1993) (quoting *Marta v. Trincia*, 22 A.2d 519, 521 (Del. Ch. 1941)) (internal quotation marks omitted).

"predecessor in title was under the impression that she was conveying to the plaintiffs the property in dispute, and the plaintiffs were under the impression that by reason of the deed they were obtaining title to that property" even if the instrument does not convey legal title to the property.[105] "Privity is the connecting link; a paper transfer is only one means of establishing it."[106]

Hastings argues that Treherne's continuous possession did not include the time Amos rented the Church or during Holley's or Rhodes' possession since they did not own the land or claim adverse possession.[107] I disagree. Treherne has proven that he and his predecessors in interest have held the Disputed Land for more than 20 years. Holley and Rhodes held the Disputed Land beginning around 1980, followed by Amos in 2002, and Treherne from 2011 until 2017. Although the deeds did not convey legal title, Treherne presented sufficient evidence that Holley and Rhodes believed they owned the Church and the Disputed Land and were conveying rights in the Disputed Land to Amos and that Amos also believed he owned the

---

[105] *Marvel v. Barley Mill Road Homes*, 104 A.2d 908, 913 (Del. Ch. 1954).

[106] *Id.* at 914.

[107] D.I. 45, at 8.

22

Church and Disputed Land.[108]  This is sufficient to establish tacking, and Treherne

has shown 20 years of continuous adverse possession.[109]

4.  Adverse Possessors' Use Was Not Permissive

Since I find that Treherne has shown, by a preponderance of the evidence,

open and notorious, hostile and adverse, exclusive and actual possession for more

than 20 years,  Hastings must demonstrate that the use of the Disputed Land was

permissive to defeat Treherne's claim, also by a preponderance of the evidence.[110]

Hastings asserts that the use was permissive.[111]  This could be established by

evidence of a landlord-tenant or other permissive relationship.[112]  Once established,

"[a] use that is initially permissive can become adverse only by express or implied

---

[108] *See* Trial Tr. 22:4-6; *id.* 32:10-11; *see also id.* 38:20-21 ("[Amos] believed that church was part of the deal when he bought the property."); *id.* 55:5-7; *id.* 141:15-19 ("[Amos] told the church that him and Mr. Holley sat down and discussed that [Amos] was going to buy the land with the church and everything …"); *id.* 150:2-151:3 (Jessie Pitts' testimony that Holley "believed he owned [the Church]").

[109] *See Marvel*, 104 A.2d at 913.

[110] *In re Lot No. 36*, 2004 WL 1087336, at *2 (Del. Ch. May 10, 2004) (citations omitted); *see also David v. Steller*, 269 A.2d 203, 204 (Del. 1970) (the party claiming title or rights by adverse possession is not required to disprove permissive possession).

[111] D.I. 45, at 1-2; *id.* 9-10.

[112] *David*, 269 A.2d 203, 205 (Del. 1970).

revocation or repudiation of the license."[113]  The failure to pay or demand rent for an extended period can extinguish a tenancy.[114]

Hastings testified that, in 1980 or 1981, he and Holley entered into a landlord-tenant relationship in which Holley was permitted to use the Church and stay on the Disputed Land so long as he used it as a church and maintained it.[115]  Hastings testified that the agreement had been reduced to writing, but Hastings has since lost that document.[116]  Importantly in this relationship, Hastings did not charge Holley any rent.[117]  Hastings testified that he lost contact with Holley around 2001, at which time Holley told Hastings that his son was going to take over the Church and the Disputed Land.[118]

"The burden of proof is often dispositive in adverse possession and prescriptive easement cases for the simple reason that the passage of time obscures

---

[113] *Jones v. Collison*, 2021 WL 6143598, at *5 n. 68 (Del. Ch. Dec. 30, 2021) (quoting Restatement (Third) of Property (Servitudes) § 2.16 cmt. f (2000)) (internal quotation marks omitted).

[114] *See Monbar, Inc. v. Monaghan*, 162 A. 50, 53 (Del. Ch. 1932) (failure to demand or pay rent for 38 years extinguished the tenancy); *Dougherty v. Flemming*, 79 A. 104 (Del. Super. 1908) (failure to demand or pay rent for 60 years extinguished the tenancy); *but see Braunstein v. Black*, 62 A. 1091 (Del. Super. 1900) (failure to pay rent for 16 years did not extinguish the tenancy).

[115] Trial Tr. 196:5-10.

[116] *Id.* 199:1-8; *id.* 218:18-23.

[117] *Id.* 248:8-9 ("I never collected rent from Mr. Holley, not a dime.").

[118] *Id.* 198:7-10; *id.* 198:22-199:4.

the relevant facts."[119] I find that this is the case here. Hastings claims that the use has always been permissive because he and Holley were in a landlord-tenant relationship, but he, the landlord, never charged or collected rent, very infrequently visited the property, allowed the tenant to make whatever major changes he wished to the building, including installing a new roof, adding a new kitchen and office, without communicating with him, and did not even have a key to the property. The evidence did not show that Hastings had contact with Rhodes or anyone else associated with the Church after 2000.[120] I find this description of a landlord-tenant relationship to be so loose as to not be credible. Hastings testified that he had "over … a hundred rental properties" in Sussex County[121] and "emphasize[d] that [his] operation wasn't a mom-and-pop operation."[122] Yet, he never charged or collected rent for the use of the Disputed Land and Church, and had minimal to no contact with the purported tenant(s) for nearly 37 years.

Hastings admitted that he took steps not to disturb the Disputed Land and the Church because "[i]t's like having a rental … you make sure it's there, but you don't disturb the tenant."[123] And, although he and Cynthia testified that Hastings'

---

[119] *Savage v. Barreto*, 2013 WL 3773983, at *6 n. 48 (Del. Ch. July 17, 2013).

[120] Trial Tr. 220:12-221:22.

[121] *Id.* 218:19-20.

[122] *Id*. 250:8-9.

[123] *Id.* 201:2-4.

employees performed maintenance for the Disputed Land and the Church,[124] the examples provided of the work performed were minimal, and Williams also worked for Holley.[125]

Thus, I conclude that Hastings has not met his burden of establishing the use was permissive. Further, to the extent that there was a permissive use, I find that the 37-year period of not charging rent or otherwise asserting ownership over the property extinguished the tenancy.[126]

## D. Attorneys' Fees

Treherne seeks attorney's fees.[127] "Delaware follows the 'American Rule,' which provides that each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation."[128] Under the American Rule, each party is normally responsible for their own attorney's fees, whatever the outcome of the litigation, absent express statutory language to the contrary or an equitable doctrine exception, such as the bad faith exception.[129] "The bad faith exception is applied in

---

[124] *See id.* 199:19-200:20.

[125] *Id.* 200:23-24.

[126] *See supra* note 114 and accompanying text.

[127] *See* D.I. 1, at 9.

[128] *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017) (citation omitted); *see also ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014); *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

[129] Delaware courts have awarded attorney's fees for bad faith when "parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims." *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005) (quoting

'extraordinary circumstances' as a tool to deter abusive litigation and to protect the integrity of the judicial process."[130] This case provides no basis to conclude Hastings' actions implicated the bad faith exception and I recommend that the Court decline to shift fees.

## III. CONCLUSION

Based on the reasons set forth above, I find that Treherne has established title to the Disputed Parcel and the Church through adverse possession and recommend that the Court enter judgment in Treherne's favor. This is a final report, and exceptions may be taken under Court of Chancery Rule 144. Upon this report becoming final, Treherne should submit an implementing order.[131]

---

*Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998)) (internal quotation marks omitted); *see also RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015) (citation omitted).

[130] *Montgomery Cellular Holding Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005) (citation omitted).

[131] The implementing order shall include as an appendix a metes and bounds description of the Disputed Parcel based upon a final survey prepared from the preliminary survey submitted as Pl.'s Tr. Ex. 10.